666 So.2d 641 (1996)
Anne BANNISTER
v.
DEPARTMENT OF STREETS.
No. 95-C-0404.
Supreme Court of Louisiana.
January 16, 1996.
Rehearing Denied February 16, 1996.
*643 Kimberly A. Theriot, Avis Marie Russell, for Applicant.
Gilbert R. Buras, Jr., Robein, Urann & Lurye; for Respondent.
LEMMIE O. HIGHTOWER, Justice Pro Tempore.[*]
We granted certiorari in this case, after the court of appeal reversed a decision by the Civil Service Commission ("the Commission") upholding the termination of a classified employee in the New Orleans Department of Streets ("the Department"). The first presented issue is whether, as concluded by the court of appeal, Civil Service Rule II, § 4.16 mandatorily requires the Commission to decide appeals within ninety days. If not, then a second question concerns whether the Commission wrongly sustained Bannister's dismissal. Upon reviewing both aspects, we reverse the court of appeal judgment and reinstate the decision of the Commission.

FACTS AND PROCEDURAL HISTORY
In February 1988, Anne Bannister, a permanently classified civil service employee with the Department, received an advancement to the level of Administrative Analyst III. Over the next four years, except for her first assignment, she worked within various divisions at several positions encompassing tasks more appropriate for an entry-level *644 analyst. Following her transfer to the Department's auto pound in February 1992, she immediately began complaining to her superiors that she had been demoted, even though she continued to be paid the $26,000 per year salary commensurate with her Administrative Analyst III position. Eventually, in October 1992, she filed a formal complaint with the Commission, resulting in a determination that respondent had been working outside of her classification. Accordingly, a letter dated November 6, 1992 directed the Department to assign the employee to duties more suitable for her designated level and pay, within ten days.
Meanwhile, two days prior to the Commission's order, the auto pound manager decided to assign Bannister to the second shift (3:00 p.m. to 11:00 p.m.)[1] to alleviate a critical personnel shortage caused by the illness of Cindy Dorsey, the usual night shift Auto Facilities Supervisor. This reassignment, as stated in an inter-office memorandum, would be temporary with a duration "dictated by the return of Ms. Dorsey or changing circumstances." Bannister learned of her new post[2] on November 8, the same day she received a copy of the above-noted letter from the Commission. Even so, she did not report to her new duty assignment between November 8 and November 29, asserting illness as the cause of her absence and, in that process, utilizing sick leave.[3] Also, on November 19, apparently still believing herself to be assigned "out of class," she filed another grievance with the city civil service department.
On November 30, 1992, Bannister returned to the auto pound but reported at her usual time, 8:00 a.m. In a meeting with both the manager and the deputy parking administrator, she maintained that she could not work the night shift due to child care problems. These two superiors, however, directed her to punch out and return at 3:00 p.m. Immediately thereafter she saw an assistant director of the Department, who reaffirmed the instructions previously given. Bannister nevertheless remained at work until 1:15 p.m., and then left a note stating that she would not be able to return for the evening shift.
After that date, November 30, 1992, Bannister never again reported for work. During the next two weeks, she intermittently telephoned the Department to advise that she would not be working on the day of her call. On most of these occasions, according to the facility's sick log, she gave absolutely no reason for her absence. In fact, in her last call to the Department on December 14, she simply indicated she could not return for the rest of that week. Meanwhile, on December 3, she formally appealed to the Commission concerning her new assignment.
Eventually, the Department director sent a certified letter to Bannister's residence on Thursday, January 7, 1993, ordering that she report for the night shift by the following Monday or face possible termination.[4] Still, she did not return. Finally, after the employee had remained absent for more than two months, the Department instituted a termination proceeding on February 2, 1993. The administrative board, finding that respondent abandoned her job in violation of applicable civil service rules, discharged her from employment. On February 10, 1993, she received an official notification to that effect.
*645 One month later, Bannister appealed her termination to the Commission. After consolidating that issue with the night shift complaint mentioned earlier, a hearing examiner tried the matter on June 28, 1993, and thirty days later issued his recommendation to uphold the dismissal. The Commission affirmed the termination on January 19, 1994, while also denying the respondent's motion for judgment in her favor on grounds that the adjudicative body had not decided the appeal within the ninety-day period provided by Civil Service Rule II, § 4.16. The Commission concluded that, despite coincidences suggesting "a prima facie violation" of civil service anti-retaliation rules, such circumstances did not justify Bannister's extended abandonment of a work assignment entailing nothing "manifestly illegal or immoral."
Respondent then sought a reexamination of the matter in the Fourth Circuit Court of Appeal. There, a three-judge panel, with one member dissenting, interpreted the time frame enunciated in Civil Service Rule II, § 4.16 to be mandatory. Bannister v. Department of Streets, 94-0604 (La.App. 4th Cir. 11/30/94), 647 So.2d 382. That conclusion, in the majority's view, required a reversal of the Commission's belated ruling and the reinstatement of Bannister to her former position with all back pay and benefits restored. Also, in dictum, the court of appeal pronounced that Bannister had been constructively discharged, thus justifying her refusal to return to work. We granted certiorari to review that decision. Bannister v. Department of Streets, 94-0404 (La. 04/28/95), 653 So.2d 581.

DISCUSSION

Timeliness of the Commission's Decision
The action of the Commission, in rendering its decision on January 19, 1994, plainly transpired eighty-seven days beyond the ninety-day period mentioned in Civil Service Rule II, § 4.16.[5] That inobservance of the Commission's own rule, according to the court of appeal, mandated that the administrative decree be reversed and that Bannister be reinstated. We disagree.
The civil service provisions in the state constitution and the rules of the Commission are designed to protect public career employees from political discrimination by eliminating the "spoils" system. La. Const. art. X, § 1, et seq.; Sanders v. Department of Health & Human Resources, 388 So.2d 768 (La.1980); Louisiana Civil Service League v. Forbes, 258 La. 390, 246 So.2d 800 (1971). Essentially, civil service laws and rules establish a system under which "non-policy forming" public employees are selected on the basis of merit and can be discharged only for insubordination, incompetency, or improper conduct, and not for religious or political reasons. New Orleans Firefighters Ass'n v. Civil Service Com'n of the City of New Orleans, 422 So.2d 402 (La.1982).
To further these goals, and in addition to its primary function as a quasi-judicial body, the civil service commission is empowered to generally supervise the civil service system and to establish rules for that system's administration. Civil service rules thus have the effect of law. La. Const. art. X, § 10(A)(4). Likewise, in regard to whether a civil service rule is mandatory or directory, such a construction will generally be made in accordance with the standards for interpreting statutes. If mandatory, beyond requiring the doing of the thing specified, such provisions describe the result that will follow where the required thing is not done; if directory, the terms are limited to what is required to be done. Sanders, supra.
Concerning imperatively phrased procedural requirements such as the one here at issue, the determination of whether these are mandatory cannot be based upon a mere literal reading, but, instead, necessitates ascertaining the intent of the drafters. Id. Certainly, if a requirement is so essential to the statutory plan that the legislative intent would be frustrated by noncompliance, *646 it should be interpreted as mandatory. Id.; United States v. St. Regis Paper Co., 355 F.2d 688 (2d Cir.1966). On the other hand, provisions designed to secure order, system, and dispatch in proceedings by guiding the discharge of a governmental official's duties are usually construed as directory even if worded in the imperative, especially when the alternative is harshness or absurdity. Sanders, supra; Ralpho v. Bell, 569 F.2d 607 (D.C.Cir.1977).
So then, if the law's purpose is the protection of the government by guiding its officials rather than granting rights to affected private citizens, the word "shall" may be given merely directory meaning. Sanders, supra; Triangle Candy Co. v. United States, 144 F.2d 195 (9th Cir.1944). Further, in deciding whether a requirement will be given mandatory or directory effect, a significant consideration lies in comparing the results to which each such construction would lead. Sanders, supra; Holbrook v. United States, 284 F.2d 747 (9th Cir.1960).
As disclosed by its introductory clause, the purpose of Rule II, § 4.16 is to assure that the Commission promptly renders decisions in its appeals. Additionally, the provision states that such determinations are to be rendered "in any event" within ninety days after receiving the hearing officer's work. The secondary nature of this added clause, although seemingly couched as an imperative, discloses an intent merely to guide the Commission in its duties by proposing system and dispatch in its proceedings. Furthermore, the auxiliary verb "shall" is clausally and directly linked with "be decided promptly," the primary facet of the rule, rather than with the language concerning the ninety-day period self-imposed by the Commission. We thus read the indicated time specification to amplify the rule's stated purpose, but, nevertheless, to be merely directory in nature.
In reaching that conclusion, we are also impressed by the fact that Rule II, § 4.16 relates solely to the Commission's own actions. Understandably, once litigants in a civil service proceeding present their case, its resolution is then placed beyond their control and into the hands of the administrative body. Yet, the mandatory application of the rule in question would cause the parties to win or lose simply as a result of unintended actionseven neglectby that agency. Such an outcome, rather than fostering decisions based on the merits, would allow sheer technicalities to defeat actual justice. See Lamb v. Lamb, 430 So.2d 51 (La.1983); Berry v. Frank, 93-1163 (La.App. 3d Cir. 05/04/94), 640 So.2d 479.
We also note that Rule II, § 4.16 does not set forth the result that will follow a failure to comply. Although our Sanders decision did not formulate a bright-line standard regarding the absence of a penalty, it is important to recognize both the potential ramifications of such an omission from a rule and that it generally indicates a discretionary intent by the drafters. In the situation at hand, for instance, neither party had been properly forewarned or given an opportunity to avoid the unknown consequences which might follow from the Commission's failure to act.
Neither should an analysis of Rule II, § 4.16 concentrate solely on the possible prejudice evolving to the employee from any stalled decisions. Such a limited focus ignores the right and duty of the appointing authority, as agent for the citizenry, to undertake disciplinary action against an employee for legal cause impairing the efficiency of the public service. See Newman v. Department of Fire, 425 So.2d 753 (La.1983). Without doubt, equally as great an injustice may arise from suffering the continuance of incompetent or insubordinate civil servants as from wrongfully terminating the "protected property rights of permanently classified civil service employees to their positions," Bannister, 647 So.2d at 386. Both concerns are fundamental to the purpose of the civil service merit system. See generally New Orleans Firefighters Ass'n, supra. Importantly too, the Commission's authority to award back pay, to reinstate benefits, and to modify disciplinary actions, see La. Const. art. X, § 12; Civil Service Rule II, § 10.1, can be utilized to largely rectify the potential *647 prejudice resulting from a delayed ruling in favor of the employee.[6]
Similarly, save the delay at issue, the proceedings here are shown to have complied with all applicable procedures governing the classified civil service. Thus, consistent with due process, respondent received the full and thorough evaluation she requested. Nor does the record disclose that the Commission deliberately delayed the rendition of its decision.
In light of these considerations and as stated, we find Civil Service Rule II, § 4.16 to be directory in nature. To conclude otherwise would absurdly result in deciding civil service proceedings on the basis of mere technicalities, rather than the merits, and would thus undermine the fundamental purpose of the civil service system. Consequently, the court of appeal erred in reversing the Commission decision because of its delayed rendition.

Merits of the Commission Decision
In civil service disciplinary cases, an appellate court is presented with a multifaceted review function. Walters v. Department of Police of the City of New Orleans, 454 So.2d 106 (La.1984). First, as in other civil matters, deference will be given to the factual conclusions of the Commission. Id.; Newman, supra. Hence, in deciding whether to affirm the Commission's factual findings, a reviewing court should apply the clearly wrong or manifest error rule prescribed generally for appellate review. Walters, supra; see also Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). The present record, measured by that standard, discloses no error by the Commission.
Second, in evaluating the Commission's determination as to whether the disciplinary action is both based on legal cause and commensurate with the infraction, the court should not modify the Commission's order unless it is arbitrary, capricious, or characterized by abuse of discretion. Walters, supra; Newman, supra; cf. La.R.S. 49:964. "Arbitrary or capricious" means the absence of a rational basis for the action taken. Shields v. City of Shreveport, 579 So.2d 961 (La.1991), citing Bicknell v. United States, 422 F.2d 1055 (5th Cir.1970).
Employees with permanent status in the classified civil service may be disciplined only for cause expressed in writing. La. Const. art. X, § 8(A). "Cause" for the dismissal of such a person includes conduct prejudicial to the public service involved or detrimental to its efficient operation. Walters, supra, and authorities therein. Stated differently, disciplinary action against a civil service employee will be deemed arbitrary and capricious unless there is a real and substantial relationship between the improper conduct and the "efficient operation" of the public service. Newman, supra.
In the case sub judice, Bannister refused to accept her job assignment and, without adequate explanation, did not return to work for more than two months. At the Commission hearing she offered two strictly personal rationalizations for not accepting the night shift position. The first, her child care problem, apparently was the sole reason stated to her superiors. As for the second, her evening employment at the post office, she only testified that her supervisors knew about the other job and that the conflict existed. Plainly, for whatever cause, she decided not to work at the lower-classified administrative analyst position to which she believed she had been transferred in retaliation for earlier complaints.
The hearing on Bannister's appeal addressed all her complaints. Although concluding she had been assigned below her appropriate responsibility level[7] and that the situation suggested a prima facie instance of retaliation, the Commission found the abandonment of her job to be unjustified. Obviously weighing both the Department's conduct and the implicated public service demands, the Commission stated *648 that Bannister's objection to the new position "did not relieve her of the obligation of every employee to follow orders which are not manifestly illegal or immoral." It particularly noted that Bannister's salary had never been reduced through her reassignment. Accordingly, the adjudicative body determined that, while she properly objected about her circumstances, Bannister's employment duties required that she comply with her superior's directives until the grievance had been resolved. Simply put, it decided that two wrongs do not make a right.
Most assuredly, the record provides a rational basis for the Commission's decision. This is certainly not an extreme case such as, say, an engineer being assigned to work on a garbage truck, nor one involving blatant sexual harassment. As observed by the Commission, neither did respondent's temporary assignment as the night shift Auto Facility Supervisor represent anything patently illegal or immoral. To the contrary, the arrangement designated the best qualified person to fill a void caused by another employee's illness. Although the assigned job did not rise to the level of Bannister's classification, it did constitute a significant promotion from her immediately previous duties. Further, as the sole person in charge of the auto pound at night, she approached being in control of the entire operation, a job performed by the Parking Section Manager and previously held by Analyst III personnel. What is more, the record suggests that respondent's decision to remain absent from work had been motivated as much by her personal dilemma as by other reasons.[8] In any event, the temporary nature of the assignment should have eased most of Bannister's dissatisfaction.[9]
In this situation, a public service employee obviously may not unilaterally leave his or her assigned job. Only under the most drastic circumstances would that be a proper reaction. Bannister should have taken her night shift assignment while also continuing to pursue, through proper channels, her complaints regarding "working out of class" and possible retaliation. In short, by failing to report to her duty station without adequate explanation, respondent seriously impaired the efficiency and orderly operation of the public service involved.[10] Cf. Church v. New Orleans Aviation Board, supra at fn. 8; King v. Department of Transp. and Development, 607 So.2d 789 (La.App. 1st Cir.1992); Carbonell v. Department of Health and Human Resources, 444 So.2d 151 (La.App. 1st Cir.1983), writ denied.
Nor do the facts before us establish that Bannister had been constructively discharged, even assuming arguendo that the concept somehow applied in civil service disciplinary cases. To support such a claim (actually, a prerequisite of certain damages in federal employment discrimination actions), an employee must prove working conditions so difficult or unpleasant that a reasonable person placed in that position would have felt compelled to resign. Ugalde v. W.A. McKenzie Asphalt Co., 990 F.2d 239 (5th Cir.1993); Jurgens v. E.E.O.C., 903 F.2d 386 (5th Cir.1990); Bourque v. Powell Electrical Mfg. Co., 617 F.2d 61 (5th Cir.1980). Unquestionably, respondent failed to show such circumstances.
*649 In conclusion and for these reasons, the Commission's determination is not arbitrary, capricious, or characterized by an abuse of discretion. That being so, the court of appeal erred in reversing the civil service authority's affirmance of Bannister's termination.

DECREE
The judgment of the court of appeal is accordingly reversed, and the New Orleans Civil Service Commission's termination of Anne Bannister from her position with the Department of Streets of the City of New Orleans is reinstated. All costs are assessed against respondent.
REVERSED AND RENDERED.
JOHNSON, J. dissents.
NOTES
[*] Judge Lemmie O. Hightower of the Court of Appeal, Second Circuit, sitting by assignment in the vacancy created by the resignation of Dennis, J.

Marcus, J. not on Panel. Rule IV, Part 2, § 3.
[1] During her civil service career, Bannister apparently had always worked daytime hours and had secured a night job at the U.S. Post Office.
[2] Essentially, she would manage the entire auto pound at night, which included such duties as allocating manpower and maintaining inventory and driver performance statistics. Respondent testified, and a city personnel officer agreed, that these responsibilities did not match her job classification. The Department, however, as shown by correspondence to civil service authorities, categorized the position as consistent with that of an Analyst III.
[3] Investigation by the city's Office of Municipal Investigation showed no sick leave abuse, despite a complaint that Bannister continued working her night job at the post office.
[4] Respondent denied receiving the letter, but a resident of her household signed the postal receipt on January 9, 1993. Similarly, upon attempting to hand deliver the same correspondence, an agent of the Department had been ordered off Bannister's property.
[5] In pertinent part, Civil Service Rule II, § 4.16 provides:

Appeals to the Commission shall be decided promptly, but in any event within ninety (90) calendar days after ... receipt by the Commission of the Hearing Officer's report and official transcript of the testimony of said hearing.
[6] In brief, Bannister also acknowledges that the supervisory jurisdiction of the appellate courts could likely be invoked by an employee subjected to an inordinate delay during an appeal.
[7] The hearing testimony indicated that the Auto Facilities Supervisor position is equivalent to an Analyst I.
[8] Bannister demonstrated no serious attempt to resolve her child care problem. As for her evening work, respondent simply faced the common choice of deciding the relative importance of two positions. Such a conflict should not be allowed to impair the public service. Cf. Church v. New Orleans Aviation Board, 612 So.2d 126 (La.App. 4th Cir. 1992), writ denied (sustaining termination of a civil service employee who worked for three weeks at temporary high-paying employment in Alaska without valid leave).
[9] Bannister maintained that no other Analyst III worked nighttime hours. Testimony by the city personnel officer, however, indicated that at least three Analyst III's worked at the auto pound in the past and frequently worked the second shift on an "as needed" basis. Furthermore, nothing appears unreasonable about requiring a person in plaintiff's employment class to work from 3:00 p.m. to 11:00 p.m.
[10] Furthermore, when the civil service department attempted to assess Bannister's new job in relation to her classification, her absence actually hindered the process because the needed paperwork could not be prepared without the employee's participation. The record also contains undisputed testimony showing Bannister, during the events in question, to be less than cooperative with the various city agencies involved.