| THIBODEAUX, Judge.
Danny Perkins and Dallas Lewis, civil service employees of the Rapides Parish Police Jury (hereinafter “Police Jury”), filed grievances against the Police Jury, alleging that the hiring of a highway superintendent was influenced by political interference. In addition, Perkins sought compensation for work performed as a result of reclassification during the years 1994-1996 and reimbursement for expenses incurred in obtaining his commercial driver’s license. The trial court reversed the LRapides Parish Civil Service Board’s (hereinafter “the Board”) finding that political intervention did not occur in the selection of the highway superintendent. Accordingly, the court ordered the Board to reopen the qualification procedure in compliance with the Civil Service Rules. Moreover, the trial court amended *609 the Board’s award of back pay to Perkins to include the years 1994 to 1996. It ordered that Perkins continue to be classified in the supervisory position to which he was appointed. Finally, the trial court affirmed the Board’s decision to reimburse Perkins for expenses incurred in obtaining his driver’s license. For the reasons which follow, we amend the trial court’s judgment and award Perkins a five percent increase in his base pay for the years 1994-1996. In all other respects, the judgment of the trial court is affirmed.
I.

ISSUES

We shall consider:
1. whether the grievances of Perkins were filed timely;
2. whether political interference influenced the selection of the highway superintendent;
3. whether Perkins should be granted a five percent increase in his base pay for the years 1994-1996;
4. whether Perkins should be granted an increase in pay from a R-9 level to a R-14 level;
5. whether Perkins should be reimbursed for the cost of his commercial driver’s license; and
6. whether Perkins is entitled to an award of attorney fees.
Jail-

FACTS

Danny Perkins and Dallas Lewis are civil service employees of the Rapides Parish Police Jury. Perkins was employed as a sign shop manager. In April of 1993, his supervisor, Cecil Raggio, assigned him to work in the resealing program of an asphalt crew. Perkins occupied this position for approximately two years. Raggio testified at a civil service grievance hearing that Perkins performed the functions of both positions during this time, but was not compensated for working outside of his job classification.[1] In February of 1995, Raggio requested that Perkins be reclassified and receive a five percent increase in pay. Subsequently, the Board reclassified Perkins as the supervisor of the asphalt program.
In March of 1996, Raggio attended a meeting that was called by the president of the Police Jury, Richard Billings. Raggio testified that he was questioned as to whether the asphalt program needed Perkins to perform the supervisory duties. Raggio testified that Billings instructed him to remove Perkins from the position. Since that time, Perkins has worked as a sign shop manager.
In April of 1995, Perkins, Lewis, and Jack Hathorne applied for the position of highway superintendent. As Public Works Director, Raggio issued an advisory recommendation to the Police Jury. Upon Raggio’s recommendation, Hathorne was selected. Lewis, an employee of the Police Jury for twenty one years, agreed to assist Hathorne and act as highway superintendent in Hathorne’s absence. Lewis testified that he performed the highway superintendent duties while Hathorne was absent from work due to two open heart surgeries. He also testified that | ¿throughout Hathorne’s tenure as highway superintendent, he assisted Hathorne with ninety percent of the paperwork.
Lewis, Perkins, and Waylon Davis applied for the highway superintendent position in March of 1997 upon Hathorne’s retirement. Perkins testified that the civil service ranked the applicants and that he was ranked number one. He also scored the highest on the civil service test and had the most seniority. Davis was selected by the Police Jury upon Raggio’s recommendation. Subsequently, Lewis and Perkins filed grievances with the Board, *610 alleging that Davis was a close personal friend of Billings and that Billings intervened in the hiring process.
III.

LAW AND ARGUMENT

In reviewing the Board’s findings of fact, the “reviewing court should apply the clearly wrong or manifest error rule prescribed generally for appellate review.” Bannister v. Department of Streets, 95-0404, p. 8 (La.1/16/96); 666 So.2d 641, 647. However, “the judicial review function is not so limited with respect to the [Board’s] decisions as to jurisdiction, procedure, and interpretation of laws and regulations.” Walters v. Department of Police of City of New Orleans, 454 So.2d 106, 113 (La.1984).
Prescription
The Police Jury contends that with the exception of the grievance alleging political intervention in the hiring process, the grievances of Perkins were filed untimely. On July 25, 1994, the Board adopted Rule II, Section 4(4.4), requiring an employee to file an appeal to the Board within ninety days of acquiring | ^knowledge of an offensive action. The Police Jury asserts that as Perkins did not comply with this requirement, the Board and the trial court erred in considering his grievances.
We find that the grievances of Perkins were filed timely. On July 1, 1997, the Board adopted Amendment 9, which specifies the procedures to be employed in handling an employee’s grievances. Section 6.7 of Amendment 9 provides:
Grievances which are described in Civil Service Rule II Section 4 should be filed with the Civil Service Board as appeals in the manner shown in Rule II Section 4.3 and within the time limits indicated in Rule II Section 4.4. (All pending grievances at the date of adoption of these rules shall have 90 (ninety) days from that date to submit a grievance in accordance with these rules).
(Emphasis added). Thus, Perkins had ninety days from the adoption of Amendment 9 to submit his pending grievances. As Perkins complied with this requirement, we conclude that the trial court did not err in finding that the grievances were filed timely. We reject the Police Jury’s argument that Rule II, Section 4(4.4) is applicable. Section 4(4.1) provides:
Employees in the classified service shall have the right to appeal to the Board any suspension, dismissal, layoff, reprimand, reduction in pay or demotion. Any complaint not specifically covered under this rule shall fall under the procedure of Section 6.
As the grievances in question are not specifically covered by Section 4(4.1), the time limit imposed by Section 4(4.4) is inapplicable.
Political Interference
The Police Jury contends that the trial court erred in finding there was political interference in the selection of the highway superintendent. It emphasizes that at the December 2, 1997 grievance hearing, Raggio denied that anyone attempted |fito influence him to recommend Davis. Billings testified that he did not exert any political influence on behalf of Davis. Moreover, the Police Jury contends that the trial court’s written reasons do not support its finding that political interference occurred in the selection of the highway superintendent as the court focused on whether Billings interfered with Perkins’ promotion as a supervisor of the asphalt program.
At the outset, we note that an appeal is taken from the judgment itself, not the trial court’s reasons for judgment. Davis v. Borskey, 94-2399 (La.9/5/95); 660 So.2d 17. Upon our review of the record, we find that Perkins and Lewis established there was political interference in the selection of the highway superintendent. We agree with the trial court that the *611 Board was manifestly erroneous in finding otherwise.
The civil service system is “designed to protect public career employees from political discrimination by eliminating the ‘spoils’ system. Essentially, civil service laws and rules establish a system under which ‘non-policy forming’ public employees are selected on the basis of merit....” Bannister, 666 So.2d at 645 (citations omitted). This rationale is reflected in Rapides Parish Civil Service Rule I, Section 2(2.1)(A):
Recruitment, selection, and advancement of employees shall be on the basis of their ability, knowledge, and skills as ascertained through fair and practical personnel management methods.
In this case, the record is replete with evidence that political interference occurred in the selection of the highway superintendent. At the December 2, 1997 grievance hearing, Raggio was questioned as to whether political intervention affected the promotion and hiring of employees of the Police Jury. Raggio testified as follows:
|7Q. [I]s there still political intervention in the hiring process from the jury? A. From time to time, yes.
Q. When a juror tries to influence you on a hiring decision ... does the political intervention sway you if all else is equal?
A. I take it a lot into consideration.
[[Image here]]
Q. Is it supposed to [sway you] under the civil service system, or is it supposed to be run more like a business, and I’m asking for your understanding, and that’s important because you’re a department head?
A. Well, I’m a department head, and I work at the pleasure of the police jury. Q. So you’re in a precarious position? A. Yes, I am.
Raggio explained that when there is an opening in the parish highway department, he recommends a candidate to the Police Jury after completion of the interview process. He stated that the Police Jury has never denied any of his recommendations. Raggio then testified that he was aware that Billings’ candidate for the superintendent position was Waylon Davis. The following exchange occurred with regard to the qualifications of each candidate:
Q. I direct you to page fifty-four of your deposition, line one. “From the standpoint of experience with building bridges and what have you, who in your mind, if you know, ... had superior knowledge and background in the day to day working? A: Dallas Lewis’ ... Q: Waylon really didn’t have that background, building bridges or anything of that nature? A: That’s correct.” Do you remember that?
A. Ido.
The testimony of Davis provides further evidence that political interference affected the selection process. Davis admitted that when he applied for [Rthe superintendent position, he “may have asked [Billings] for his support if he could.” Davis testified as follows:
Q. Did [Billings] tell you to call the other police jurors and solicit their support?
A. He may have. I don’t recall.
Q. If he testified that he did offer you that assistance, would you disagree?
A. No, I wouldn’t.
Q. Did you, in fact, call the other police jurors to elicit their support in your quest to highway superintendent?
A. I don’t know whether it was support or just to get to know some of them a little bit.
Q. Okay. Did you tell them that anything you could do for them, you would?
A. -Yes. That I would try.
At the December 2,1997 grievance hearing, Billings denied exerting any political influence on behalf of Davis. He admitted that he met privately with Lewis prior to the selection of Davis. However, he stated *612 that he did not recall whether he mentioned the likelihood that Perkins would be selected for the position. Lewis recounted Billings’ statements regarding Perkins as follows:
Q. What did he say about [Perkins]?
A. He said that as long as he was alive, Danny Perkins would never move up. And he commenced to telling-
Q. What did he say about Waylon?
A. He said that he was his number one man.
Billings admitted that Davis was his “favorite, the guy [he] wanted to get the job.” Billings acknowledged that in deposition, when questioned whether Raggio knew who his favorite was, he responded, “he’d be stupid if he didn’t.” Moreover, Billings 1 astated that he opposed the adoption of the civil service system and believed it was appropriate for him to recommend a candidate to Raggio.
We conclude that Lewis and Perkins established that political interference influenced’the selection of the highway superintendent. Therefore, we affirm that part of the trial court’s judgment ordering the Board to reopen the qualification procedure in compliance with the Civil Service Rules.
The Reallocation of Perkins
The Police Jury contends that the trial court erred in granting Perkins compensation for the work he performed as supervisor of the asphalt program during the years 1994-1996, and in maintaining Perkins in the supervisory position to which he was appointed by the Board. Citing McElveen v. Callahan, 309 So.2d 379 (La.App. 3 Cir.), writ denied, 313 So.2d 602 (La.1975), it argues that such an award of back pay is prohibited as a public body may not grant a bonus or provide extra compensation for work already performed. Moreover, the Police Jury contends that Perkins was properly removed from his supervisory position following a meeting between Raggio and Billings.
We conclude that Perkins is entitled to a five percent increase in his base pay for the years 1994-1996. Raggio, the head of the highway department and Perkins’ supervisor, instructed Perkins to work as both a supervisor of the asphalt program and sign shop manager from 1994-1996. During this time, Perkins was only compensated for his work as a sign shop manager. We agree with the trial court that Perkins is entitled to compensation for the work he performed as supervisor of the asphalt program. We reject the Police Jury’s argument that such an award constitutes a bonus or extra compensation for past services as Perkins was never compensated for performing the supervisory duties.
LnWe note that while the trial court’s written reasons award Perkins a five percent increase in his base pay for the years 1994-1996, the trial court’s judgment orders “back pay for the years from 1994 to 1996, with increases of 5% per year.” The Police Jury questions how to determine the amount to which Perkins is entitled. We find that the trial court’s written reasons state the correct method for determining the amount of the award. Perkins is entitled to receive an amount that equals a five percent increase in his base pay for the years 1994-1996.[2]
The trial court did not err in maintaining Perkins in his position as a supervisor of the asphalt program and in awarding him a pay increase from a R-9 to a R-14 level for the period of March 1996 to the present. In February of 1995, Raggio recommended to Danny Guillory, the director of the civil service, that the position of Perkins be reallocated. On March 21, 1996, the Board approved the reallocation of Perkins to the position of supervisor of the asphalt program. Several days later, following a meeting with Billings and the *613 personnel committee chairman, Raggio removed Perkins from his supervisory position and instructed him to work only as a sign shop manager. Raggio testified that Billings instructed him to order the change; Billings acknowledged that he issued the order. In a letter to Billings dated April 22, 1996, John McLure, the chairman of the Board, questioned the propriety of the action. McLure wrote:
The normal procedures that are followed with any reallocation is that after a letter request from a department head, the Director will conduct an internal survey of the position to determine what essential functions the employee is actually performing.... The Director arrives at conclusions, notifies the appropriate department head of his decision, and brings his recommendation(s) to the Board for review. The Board would then consider the merit for any classification changes.
Inin this case, the proper procedure for reallocating Perkins to the supervisory position was followed. However, this procedure was not followed in reallocating Perkins back to the position of sign shop manager. Raggio simply removed Perkins from his supervisory position after attending a meeting with Billings. We conclude that the trial court did not err in maintaining Perkins in his position of supervisor of the asphalt program.
Commercial Driver’s License
The Police Jury contends that the trial court erred in reimbursing Perkins $35.00 for the cost of obtaining his commercial driver’s license. It argues that Raggio did not approve the reimbursement upon Perkins’ request because Perkins was not required to have a commercial driver’s license to perform the functions of his job.
The trial court did not err in awarding Perkins $35.00 for the cost of obtaining his commercial driver’s license. Ware, the parish treasurer, testified at the grievance hearing that the Police Jury passed a motion authorizing the highway department to reimburse parish employees for the cost of obtaining a commercial driver’s license. Perkins testified that he was instructed by Clayton Bennett, the former highway superintendent, to obtain his commercial driver’s license. He stated that he was the only employee who did not receive reimbursement. We conclude that Perkins is entitled to be reimbursed $35.00 for the cost of obtaining his license.
Attorney Fees
In brief to this court, Perkins seeks an award of attorney fees in the amount of $12,500.00. However, La.Code Civ.P. art. 2133(A) provides, in relevant part, as follows:
|1gAn appellee shall not be obliged to answer the appeal unless he desires to have the judgment modified, revised, or reversed in part or unless he demands damages against the appellant. In such cases, he must file an answer to the appeal, stating the relief demanded, not later than fifteen days after the return day or the lodging of the record whichever is later.
In this case, Perkins failed to answer the appeal. An appellate brief or argument in an appellate brief does not satisfy the requirements of Article 2133. See Bond v. Allemand, 632 So.2d 326 (La.App. 1 Cir.1993), writ denied, 94-0718 (La.4/29/94); 637 So.2d 468. Thus, Perkins’ claim is not properly before this court and will not be considered.
IV.

CONCLUSION

Based on the foregoing' reasons, we amend the trial court’s judgment and award Perkins a five percent increase in his base pay for the years 1994-1996. In all other respects, the judgment of the trial court is affirmed. Court costs in the amount of $520.50 are assessed against the Rapides Parish Police Jury.
AFFIRMED AS AMENDED.

. A sign shop manager is compensated at the R-9 level, while a supervisor of the asphalt program is compensated at the R-14 level.

. Civil Service Rule IV, Section 2.6(E)(1) provides: "Reallocation of a position or positions to a class with a higher range shall cause the employee's rate of pay to increase five (5) percent or to the minimum of the new range, whichever is greater.”