# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 03-483


DAMON LACOMBE

VERSUS

LAFAYETTE CITY-PARISH
CONSOLIDATED GOVERNMENT, ET AL.


************

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT,
PARISH OF LAFAYETTE, NO. 2001-4659,
HONORABLE THOMAS R. DUPLANTIER, DISTRICT JUDGE

************

## MICHAEL G. SULLIVAN
## JUDGE

************

Court composed of Billie Colombaro Woodard, Michael G. Sullivan, and Billy H. Ezell, Judges.


**AFFIRMED.**

Richard D. Chappuis, Jr.
Kristen B. Menard
Voorhies & Labbe
Post Office Box 3527
Lafayette, Louisiana  70502
(337) 232-9700
Counsel for Defendant/Appellant:
        Lafayette City-Parish Consolidated Government

Andrea J. Wilkes
Louis L. Robein, Jr.
Robein, Urann & Lurye
Post Office Box 6768
Metairie, Louisiana  70009-6768
(504) 885-9994
Counsel for Plaintiff/Appellee:
        Damon Lacombe

**M. Candice Hattan**
**Post Office Drawer 91850**
**Lafayette, Louisiana  70509**
**(337) 234-0431**
**Counsel for Defendant:**
  **Lafayette Municipal Fire & Police Civil Service Board**

SULLIVAN, Judge.

The Lafayette City-Parish Consolidated Government (the City-Parish) appeals the trial court's reversal of the termination of firefighter Damon Lacombe. For the followings reasons, we affirm.

**Facts and Procedural History**

Lacombe, a captain in the Fire Department with eighteen years of service, was terminated on June 25, 2001, after Fire Chief Robert Benoit determined that Lacombe failed to cooperate fully and truthfully in an internal affairs investigation. The subject of the investigation was an alleged "blue flu" or sickout that occurred between Friday, March 31, 2000, and Monday, April 3, 2000, when 141 out of 194 Lafayette firefighters called in sick during those four days.

On the first three days of the alleged sickout, Lacombe worked sixty hours of overtime as one of the many off-duty firemen called to manage the personnel shortage. He then called in sick on Monday, April 3, 2000, which was his regularly-scheduled shift, contending that he developed stomach problems over the weekend. No one has questioned his explanation for not working on Monday, and the disciplinary action taken against him arises from his conduct in the subsequent investigation rather than from his taking a sick day at that time.

While working at Fire Station #9 on Friday, March 31, 2000, Lacombe telephoned communications officer Wayne Chauvin, who was on duty at another station. The two gossiped about the unfolding events, with Lacombe stating that he heard that ten firefighters had called in sick that day and asking, "What's the count? What's the count?" Chauvin informed him that the number was only three, but that he had "heard through the grape vine [sic]" that it would be worse the next day. Lacombe also made comments such as "They got to come to us one day," and "They

gonna wish they would have took that f— meeting." Lacombe was unaware that this conversation was being recorded.

On April 24, 2000, Lacombe was interviewed by the Fire Department's internal affairs division about his knowledge of the events of March 31 through April 3, 2000. When asked when he first learned that "there were so many persons who had begun to call in sick," he replied that it was probably on the six o'clock evening news on Saturday, April 1, 2000, apparently referring to a televised press conference in which Chief Benoit informed the public of the situation. Lacombe also stated that he had no idea why so many firefighters had called in sick.

In another interview on June 27, 2000, Lacombe was confronted with a tape of his conversation with Chauvin. When asked who "they" referred to in the conversation, Lacombe first replied that it could have been anybody, as no particular individual was named, but he later agreed that it "[m]ay have been" the City-Parish administration and its president, Walter Comeaux. He was asked again when he first learned "that everybody had began to call in sick," and he replied that he had learned on Friday, either when he got to work or earlier on the street, that three people had called in sick that day. When he was reminded he had previously said that he learned about it on the Saturday evening news, he replied, "[W]hat I heard on the news Saturday was about the numerous or the big amount of people and when the Chief came on the TV and said that there was so called a Blue Flu or sick-out or whatever it was, but at that time it was just three people."[1]

Finding that Lacombe's April 24, 2000 statement was in conflict with the recorded telephone conversation and that Lacombe failed to cooperate when given the

---

[1]The parties stipulated to the number of firefighters calling in sick each day as follows: Friday, March 21, 2000—6; Saturday, April 1, 2000—40; Sunday, April 2, 2000—47; Monday, April 3, 2000–47.

opportunity on June 27, 2000 to explain the telephone conversation, Chief Benoit determined that Lacombe was in violation of Fire Department and City-Parish policies requiring cooperation and truthfulness in any work-related administrative investigation. On February 2, 2001, Chief Benoit informed Lacombe that a disciplinary hearing would be held to determine if any action should be taken against him. After a hearing on March 15, 2001, the Lafayette Fire Department Disciplinary Board, by majority vote, determined that Lacombe should receive a written reprimand.

Citing "substantial inconsistencies" between Lacombe's statements and the recorded conversation, Chief Benoit chose to disregard the pre-disciplinary recommendation and instead terminated Lacombe on June 25, 2001. Lacombe appealed to the Lafayette Municipal Fire and Police Civil Service Board (the Board), which voted 3-2 to affirm the termination after a hearing on August 14, 2001. Upon the Board's denial of his limited motion for a rehearing, Lacombe appealed his termination to the Fifteenth Judicial District Court. The district court reversed the Board's decision and reinstated Lacombe with back pay and benefits, finding no legal cause for termination. On appeal, the City-Parish argues that the Board's decision was supported by the record.

**Opinion**

Employees with permanent status in the classified civil service may be disciplined only for cause expressed in writing. La.Const. art. X, §8 (A). The civil service provisions are designed to protect public career employees from political discrimination, so that "'non-policy forming' public employees are selected on the basis of merit and can be discharged only for insubordination, incompetency, or improper conduct, and not for religious or political reasons." *Bannister v. Dep't of Streets*, 95-404, pp. 4-5 (La. 1/16/96), 666 So.2d 641, 645.

3

Under La.R.S. 33:2500(A)(3) (emphasis added), a classified civil service employee may be terminated or disciplined for the "commission or omission of any act *to the prejudice of the departmental service or contrary to the public interest or policy*." If the employee believes that he has been disciplined or discharged without just cause, he may demand "a hearing and investigation by the board to determine the reasonableness of the action." La.R.S. 33:2501(A). The actions that the Board may take are spelled out in La.R.S. 33:2501(C)(1) (emphasis added) as follows:

> [T]he board may, *if the evidence is conclusive*, *affirm* the action of the appointing authority. If they find that the action was not taken in *good faith for cause* under the provisions of this Part, the board shall order the immediate *reinstatement or reemployment* of such person in the office, place, position, or employment from which he was removed, suspended, demoted, or discharged, *which reinstatement shall, if the board so provides, be retroactive* and entitle him to his regular pay from the time of removal, suspension, demotion, discharge, or other disciplinary action. The board may *modify* the order of removal, suspension, demotion, discharge, or other disciplinary action *by directing a suspension without pay, for a given period*.

The Board's decision is subject to appeal in the district court of the parish where the Board is domiciled; however, "[t]his hearing shall be confined to the determination of whether the decision made by the board was made *in good faith for cause* under the provisions of this Part." La.R.S. 33:2501(E)(3) (emphasis added).

In *Tweedel v. Fire Protection District # 1 Civil Service Board*, 546 So.2d 654, 655 (La.App. 3 Cir. 1989), this court explained the above standard of review as follows:

> "In good faith" has been interpreted to mean the opposite of arbitrary or capricious action or action that stems from prejudice or political expediency on the part of the appointing authority. "Cause" means legal cause and the evidence must show that the dismissal was necessary for the discipline and efficiency of the service or that is was needed to avoid some detriment to the department or the city.

The supreme court also elaborated on that standard, explaining in *Bannister*, 666 So.2d at 647: "Stated differently, disciplinary action against a civil service

4

employee will be deemed arbitrary and capricious unless there is a real and substantial relationship between the improper conduct and the 'efficient operation' of the public service." Additionally, "[t]he appointing authority . . . must demonstrate, by a preponderance of the evidence, that the conduct did in fact impair the efficient and orderly operation of the public service." *Smith v. Mun. Fire & Police Civil Serv. Bd. of Eunice*, 94-625, p. 3 (La.App. 3 Cir. 11/2/94), 649 So.2d 566, 568; *see also Laborde v. Alexandria Mun. Fire & Police Civil Serv. Bd.*, 566 So.2d 426 (La.App. 3 Cir.), *writ denied*, 568 So.2d 1055 (La.1990).

Upon review of the record, we find that the district court applied the proper standard of review in reversing the Board's decision. Chief Benoit testified that Lacombe was terminated because he failed to tell the truth in an administrative investigation. Specifically, Chief Benoit believed that Lacombe was untruthful in maintaining that he had no idea why so many firefighters called in sick in light of the taped conversation in which Lacombe asked about "the count" and stated, "They got to come to us one day." According to Chief Benoit, it was obvious that Lacombe was discussing a sickout that was well-underway at that time. Even if we accept Chief Benoit's interpretation of that conversation, however, we agree with the district court that Lacombe's conduct in the subsequent investigation did not amount to legal cause for termination.

Chief Benoit testified that officials from the firefighters' union broadcast through the media and even told him personally that the sickout was the result of disgruntled employees' frustration that the City-Parish administration would not meet with them. Hence, it is unclear how Lacombe's evasiveness in identifying who "they" were impeded the investigation when the chief himself admitted that the answer was obvious. Lacombe was also criticized for stating that he first learned that "so many

5

persons" were calling in sick on Saturday, when he appeared to be discussing the sickout in the taped conversation on Friday. However, the parties stipulated that, at the time of the conversation, at most six firefighters had called in sick.

Chief Benoit described Lacombe, an eighteen-year veteran, as a "super" firefighter who "lived and breathed" the fire department and who had a reputation for always accepting overtime duty. Chief Benoit referred to Lacombe as a "casualty of war" who allowed unknown "conspirators" to influence him, but as the chief testified, "[T]he ones who caused this problem are not the ones that got caught."

In *Lantier v. Lafayette City Parish Consolidated Government,* 02-1318 (La.App. 3 Cir. 3/5/03), 839 So.2d 1176, we reversed the termination of a firefighter who was also involved in the present investigation, finding that he was dismissed, "not because he violated a disciplinary rule, but because he did not provide the information required by Chief Benoit." *Id.* at 1180. In *Lantier*, Chief Benoit also testified that the "conspirators of this sickout were not going to get caught. It was going to be the innocent individuals who didn't want to go along with this program . . . . [*Lantier*] *was an innocent victim of circumstance*." *Id.* As was the case in *Lantier*, Lacombe was not charged with participating in the sickout, but was apparently disciplined because it took place.[2] On the record before us, we agree with the trial court that the City-Parish failed to demonstrate "a real and substantial relationship" between Lacombe's conduct and the "efficient operation" of the fire department. *Bannister*, 666 So.2d at 647.

**Decree**

---

[2]We also point out that one Board member found that Lacombe "put his own family in danger by staging a so-called walkout," yet, the disciplinary action against him was not based upon such conduct. Another Board member found that Lacombe was not completely forthcoming and was not fully cooperative in the investigation, but then continued to state that, as a taxpayer, he was enraged at the cost of the "blue flu" and that it scared him to think firefighters would put families in jeopardy.

For the above reasons, the judgment of the trial court is affirmed. Cost of this appeal are assessed to the Lafayette City-Parish Consolidated Government to the extent allowed by law.

**AFFIRMED.**