McCLENDON, J.
| ¡.This is an appeal by the plaintiff, Adrian Brown, from a decision rendered by the State Police Commission[1] (the Commission) upholding her termination by the Department of Public Safety and Corrections, Office of State Police (State Police).. For the following reasons, we-affirm the .Commission’s decision. , ,
FACTS AND PROCEDURAL HISTORY
Ms. Brown had been employed by the State Police for more than twelve years, and was serving with permanent status as a state trooper, when she was terminated effective June 13, 2014.-, In the, termination letter, dated June 11,2014, from Lt. Colonel Charles Dupuy,. the Assistant Superintendent and Chief of Staff for the State Police, Ms. Brown was advised that hér termination was based on conduct in violation of the following sections of Louisiana State Police Policy and Procedure Order 901, Code of Conduct: Section 47, Associations; -Section 45,' Reporting of Information; Section 12(i)'(d), Unsatisfactory Performance; and Section 13, Lawful Orders. Ms.- Brown was also advised that her termination was based on conduct in violation of Louisiana State Police Policy and Procedure Order No. 242, General Orders, Section 2, Vehicle Usage Limitations and Requirements.[2]
|sMs. Brown timely appealed her termination to the Commission and, following a *766 public hearing, the Commission upheld Ms. Brown’s termination. Ms. Brown now appeals the Commission’s decision to this Court and assigns the following as error:
1) The Commission erred by finding that Ms. Brown violated Louisiana State Police Policy and Procedure Order 901, Code of Conduct, Section 47, Associations, when her relationship with Frank Mike, Jr. was sporadic and not continuous as required under the statute;
2) The Commission erred by finding that Ms. Brown violated Louisiana State Police Policy and Procedure Order 901, Code of Conduct, Section 45, Reporting of Information and Order 901, Code of Conduct Section |412(i)(d), Unsatisfactory Performance, when she reported the information given to her by Frank Mike, Jr. on April 2; and
3)The Commission erred by sustaining the harsh and capricious punishment of termination considering the mitigating circumstances involved and the truthful cooperation provided by Ms. Brown in the State Police investigation of this matter.
*767 STANDARD OF REVIEW
An employee who has gained permanent status in the classified state police service cannot be subjected to disciplinary action except for cause expressed in writing. LSA-Const. art. X, § 46(A). Such an employee may appeal to the Commission, where the burden of proof, as to the facts, is on the appointing authority. Id. The Commission shall have the exclusive power and authority to hear and decide all disciplinary cases. LSA-Const. art. X, § 50. The Commission’s authority “to hear and decide” disciplinary cases includes a duty to decide independently from the facts presented whether the appointing authority has good cause for taking disciplinary action and, if so, whether the punishment imposed is commensurate with the cause. Department of Public Safety and Corrections, Office of State Police v. Mensman, 95-1950 (La.4/8/96), 671 So.2d 319, 321 (per curiam); Huval v. Department of Public Safety & Corrections, 09-0699 (La. App. 1 Cir. 10/23/09), 29 So.3d 522, 527.
The decision of the Commission shall be subject to review on any question of law or fact upon appeal to the court of appeal wherein the Commission is located. LSA-Const. art. X, § 50. In these instances, the appellate court is presented with a multifaceted review function. Bannister v. Department of Streets, 95-404 (La.1/16/96), 666 So.2d 641, 647; Huval, 29 So.3d at 527. First, as in other civil matters, the Commission’s factual findings are entitled to deference and will not be disturbed unless clearly wrong or manifestly erroneous. Second, in evaluating the Commission’s exercise of its discretion in determining whether the disciplinary action is based on legal cause and the punishment is commensurate with the infraction, the reviewing court should not modify the IsCommissioris order unless it is arbitrary, capricious, or characterized by an abuse of discretion. Bannister, 666 So.2d at 647; Huval, 29 So.3d at 527-28.
DISCUSSION
At the hearing, the parties stipulated, in writing, to the following facts:
1. On February 19, 2014, Kenneth and Lakeitha Joseph were reported missing from Reserve, Louisiana;
2. On February 27, 2014, the silver 2010 Dodge Caravan in which the couple was last seen was discovered in a suburb of Atlanta;
3. On March 10, 2014, Lakeitha Joseph’s body was pulled from the In-tracoastal Waterway in Eastern New Orleans;
4. On March 22, [2014,] Kenneth Joseph’s body was pulled from the In-tracoastal Waterway in Eastern New Orleans;
5. On the night of March 30, 2014, Adrian Brown had dinner [with] Frank Mike, Jr.;
6. Adrian Brown had known Frank Mike, Jr. for approximately one year, since approximately March 2013;
7. Adrian Brown worked a full shift at the Louisiana State Police Region 1 office at Benson Towers in New Orleans on March 31, 2014 and on April 1, 2014;
8. On April 2, 2014, at approximately 7:00 A.M. Adrian Brown contacted Lieutenant Colonel Murphy Paul to tell him about the information learned from Frank Mike, Jr. that was related to a criminal matter;
9. The April 2, 2014 report to LTC Paul was the first Adrian Brown made concerning the information she learned about Frank Mike, Jr.’s connection to a criminal matter;
10. Adrian Brown was on duty April 1, 2014;
*768 11. On April llj 2014, Adrian, Brown was placed on Administrative Leave Pending Investigation;
12. On April 15,2014 at 1045 hours, Lt, Marcelle and Sergeant Saleem El-Amin delivered letters notifying Adrian Brown of her Administrative | (¡Leave and the Administrative Investigation. The Administrative Investigation letter ordered . that Adrian Brown refrain from discussing the investigation or any facts related thereto, with anyone;
13. Louisiana State Police Policy and Procedure Order 901, Code of Conduct, Section 47, Associations, provides in pertinent part:
i) Commissioned officers shall avoid regular or continuous associations or dealings with persons whom they know are suspected felons, persons under criminal investigation or indictment, or who have a reputation in the community for present involvement in felonious or criminal behavior.
14. Louisiana State Police Policy and Procedure Order 901, Code of Conduct, Section 45, Reporting of Information, provides in pertinent part:
i) A commissioned, officer shall report to his superior officer all-.information that comes to his attention concerning organized crime, vice conditions, narcotics trafficking or its use, along with any other criminal activity or violation that an officer suspects. •
15. Louisiana State Police Policy and Procedure- Order 901, Code of Conduct, Section 12(i)(d), Unsatisfactory Performance, provides that unsatisfactory performance is demonstrated by:
d) A. failure to take the appropriate action on the occasion of a crime, disorder or other matter deserving attention.
116. Louisiana State Police Policy and Procedure Order No. 9Q1, Code of Conduct, Section 13, Lawful Orders, which states in pertinent part:
i) A commissioned officer shall promptly obey and execute any and all lawful orders of a superior officer. A “lawful order” is any order or assignmentissued either verbally ' or in writing by a superior or ranking ófficer.
17. Louisiana State Police Policy and Procedure Order No. 242, General Orders, Section 2, Vehicle Usage Limitations and Requirements, which states in pertinent part:
i) Off-duty usage of individually assigned units is prohibited on days off except as outlined below: a) To, from and in conjunction with military training or other military duty obligations;
|7b) To, from and in conjunction with an officer’s enrollment obligations with an institution of higher ' learning (except instructional responsibilities); ■ ■
c) To, from and in conjunction with activities associated with personal fitness and health maintenance; and
d) To, from and in conjunction with LSTA affiliated or sponsored activities.
The Commission also made the following findings of fact in addition to those stipulated by the parties:
18. .On March 21, 2014, [Adrian Brown] attended an Elton John concert with Frank Mike, Jr. and dinner afterward. Prior to the concert,. [Adrian Brown] entered a code in the parking lot that was reserved, -in part, for state police *769 so that Frank Mike, Jr. could enter- . and park his vehicle there.
19. On March 21, 2014, [Adrian Brown] had dinner with Frank Mike, Jr., and, afterward, [Adrian Brown], gave Frank Mike, Jr. a ride in her department vehicle to his vehicle .that was parked further away from the restaurant on Rampart Street.
20. On March 30, 2014, [Adrian Brown] had dinner with Frank Mike, Jr., and after dinner, they sat in her personal vehicle and talked. During this discussion that took place shortly after midnight on March 31,-2014, Frank Mike, Jr. advised [Adrian Brown] that he drove the van that was implicated in a double homicide to Atlanta. ■
21. On March 31, 2014, [Adrian Brown] ■ researched the double homicide of La-keitha and Kenneth Joseph on the internet while- at work.
22. On April 1, 2014, [Adrian Brown] worked a full shift and then met with Frank Mike, Jr. at City Park afterward.
23. While meeting with Frank Mike,' Jr. at City Park on April 1, 2014, [Adrian Brown] admitted that she asked Frank Mike, Jr. if [he] knew ' who committed the double homicide and that he responded that he thought ' he did [know] and that he thought a guy named “Blue” committed the crimes.
|s24. While meeting- with Frank Mike, Jr. at City Park on April 1, 2014, [Adrian Brown] admitted that she advised Frank Mike, Jr. to, turn himself, in and that if he did not do so, she would.
25.[Adrian .Brown] did not advise criminal investigators.or her, chain,of command about ■ the information learned from Frank Mike, Jr. that was related to a criminal matter until the morning of April 2, 2014 when she contacted Lieutenant Colonel Murphy Paul.
26. [Adrian- Brown] spoke with retired U.S. -Marshal Genny May for advice •related to-the 'investigation- of her ae---tions by Internal Affaiis-investigators after-she-was ordered by Internal Affairs not to discuss the investigation or the facts surrounding the investigation-with anyone.
27. [Adrian Brown] had an intimate relationship with , Frank Mike, Jr. that lasted several weeks in the spring of 2013, and after the intimate relationship ended, [Adrian Brown] remained friendly with Frank Mike, Jr. That friendship included telephone conversations,, text messages, having-dinner at restaurants, attending a concert together and [Adrian Brown] pur- . chas[ing] a massage for Frank. Mike, Jr.
Given its findings of fact, the Commis-' sion concluded that Ms. Brown “violated each of the Policies/Procedures, as alleged, the most serious of which was her failure to report, immediately, information about a double homicide while the murderer(s) had not yet been id'entified[.]” The Commission found that the factual evidence and stipulations supported each of the alleged violations. It concluded that termination of Ms. Brown’s employment was justified and was well within the range of discretion for discipline for such violations.
In her first. assignment of error, Ms. Brown argues that she did not have a regular or continuous association with Frank Mike, Jr. as defined in the policy and -procedure order regarding associations. Ms. Brown asserts that after she found, out that Frank Mike, Jr. was a convicted felon, her contact with him was *770 sporadic and brief, rather than regular or continuous. '
|gLt. Aaron Marcelle led the investigation of Ms. Brown for the State Police. He testified that the investigation revealed that Ms. Brown met Mike in the spring of 2013, that they began dating, and that several weeks into the relationship she discovered that. Mike was a convicted felon. Lt. Marcelle stated they ended their dating but remained friends. He also testified that Ms. Brown provided her cell phones for the investigation. The phone records included photographs that showed the two attending a concert together and embracing each other. There were also many text messages. When inquiring about some of the text messages in his interview with Ms. Brown, Lt. Marcelle testified that Ms. Brown stated that Mike was “stressed out” looking for employment, so she treated him to a massage. Lt. Marcelle also stated that Ms. Brown admitted that she and Mike continued to be friends after she discovered that he was a convicted felon.
Lt. Col. Murphy Paul, the Deputy Superintendent of the Bureau of Investigations for the State Police, testified that Ms. Brown indicated to him that her relationship with Mike was occasional. Through the investigation, however, he learned that their relationship was more frequent and continuing than occasional.
Ms. Brown admitted that she and Mike remained friends and that they continued to talk.
A review of the record discloses no manifest error by the Commission in its factual finding that Ms. Brown violated Louisiana State Police Policy and Procedure Order 901, Code of Conduct, Section 47, Associations. Between March 9, 2014, and April 1, 2014, over 40 texts were exchanged between Ms. Brown and Mike. Additionally, there were several telephone conversations, dinners, a concert, and pictures taken to indicate a continuing relationship. We have thoroughly reviewed the entire record and find that the Commission’s factual finding regarding Ms. Brown’s association with Mike reasonable. Accordingly, we find no merit to this assignment of error.
Ms. Brown next asserts that the Commission erred in finding violations of the policy and procedure orders regarding the reporting of information and | ^unsatisfactory performance. She attributes “the temporary delay in reporting” to her own investigation of the alleged criminal activity. Ms. Brown alleges that she was completely unaware of the factual basis for the criminal conduct that was reported to her. She testified that she therefore conducted research on her computer at work the following day. She also contends that she knew the person who reported the conduct and believed it was absolutely out of character for Mike to be involved in such activity. Ms. Brown additionally maintains that the conduct was not a violation of the policy and procedure regarding unsatisfactory performance. She contends that she never failed to report the criminal activity and that any perceived delay in reporting was explained and understandable under the circumstances.
Lt. Col. Paul testified that Ms. Brown was under his command at the time of the alleged violations. He testified that on the morning of April 2,2014, he received a text message from Ms. Brown advising him that she wanted to speak with him. Lt. Col. Paul called Ms. Brown, who told him about her relationship with Mike and what Mike had told her about the van. When Lt. Col. Paul asked Ms. Brown whether she had contacted law enforcement with regard to the information, she replied that *771 she had not. Lt. Col. Paul asked Ms. Brown why she had not reported the information, and Ms. Brown told him that she did not believe it. Lt. Col. Paul advised Ms. Brown to immediately report the information. Lt. Col. Paul testified that, considering the open investigation, he would have expected the information to have been reported immediately. Additionally, when Lt. Marcelle asked Ms. Brown why she did not report to her chain of command on March 31 or April 1, she replied that she was in shock and disbelief and did not know what to do.[3]
Lt. Col. Dupuy testified that he is responsible for the day-to-day operations of the State Police and reviews all disciplinary matters. He agreed with the outcome of the investigation in this matter, concurred with the termination | ^recommendation, and signed the termination letter. He testified regarding the seriousness of Ms. Brown’s policy violations, stating that law enforcement officers have a job and a duty to uphold the law and protect public safety. Lt. Col. Dupuy also stated that the fact that Mike was involved in a double murder was critical to the investigation and “public safety absolutely was in danger.” He testified that at that point the murderer was still at large and any information associated with the murders should have been reported. He continued:
[Ms. Brown’s] a Louisiana State Trooper. She is supposed to protect the public[;] she’s supposed to do her job as a police officer. And as soon as she found that information out, she should have acted as a police officer. She didn’t do that.
Lt. Col. Dupuy did not consider Ms. Brown’s actions up to the standard of a Louisiana State Police officer.
We find no manifest error in the factual findings of the Commission that Ms. Brown violated policy and procedure regarding the reporting of information and unsatisfactory performance. The factual findings are supported by the evidence submitted, and a reasonable basis exists for the Commission’s findings.
We next address the disciplinary action taken in this matter. As previously stated, the Commission’s exercise of its discretion in determining whether there is legal cause for imposing punishment and whether the punishment is commensurate with the infraction should not be modified by this court unless it is arbitrary, capricious or characterized by an abuse of discretion. Bannister, 666 So.2d at 647.
Ms. Brown asserts that the discipline imposed was an excessively harsh and capricious punishment considering the mitigating circumstances involved and the truthful cooperation she provided in the investigation. Ms. Brown contends that she was completely truthful in her interviews with Internal Affairs and in her testimony to the Commission. She argues that she cooperated completely with the Internal Affairs Investigation and that termination far exceeds what is commensurate with the alleged violations.
|12In its decision, the Commission noted the testimony of Lt. Col. Dupuy, who stated that the failure to immediately report information critical to a double homicide investigation, while a murder suspect was at large, jeopardized public safety and increased the risk of flight of the suspect or suspects. As we recognized in Berry v. Department of Public Safety and Corrections, 01-2186 (La.App. 1 Cir. 9/27/02), 835 So.2d 606, 615, “since the public puts its trust in the police department as a guard *772 ian of its safety, it is essential the appointing. authority be allowed to establish and enforce appropriate standards of conduct for its employees sworn to uphold that trust.” . .
Based on the evidence in the record, Ms. Brown’s violations of policy and procedure orders clearly support the disciplinary-, action taken by the State Police in terminating her and the Commission’s decision to uphold the termination. We do not find that the Commission’s decision to uphold Ms. Brown’s employment termination was arbitrary, capricious, or characterized by an abuse of discretion. We agree with the Commission’s conclusion that Ms. Brown’s termination was warranted' and commensurate with her violations of policy and procedure. Accordingly, we find no merit to Ms. Brown’s third assignment of error.
CONCLUSION
For the foregoing reasons, we affirm the decision of the State Police Commission, upholding the termination of employment of Adrian Brown by the Department of Public Safety and Corrections, Office of State Police. All costs associated with this appeal are assessed against Adrian Brown.
AFFIRMED,

. The State Police Commission was created by constitutional amendment and given the "exclusive power and authority to hear and decide all -removal and disciplinary cases." LSA-Const, art. X, §§ 43 and 50. The State Police Commission’s power to “hear and decide" cases is identical to that granted the State Civil Service Commission. Department of Public Safety and Corrections, Office of State Police v. Mensman, 95-1950 (La.4/8/96), 671 So.2d 319, 320, n. 1 (per curiam).

. The termination letter provided, in part:
On April 2, 2014, you contacted Lieutenant Colonel Murphy Paul about information you learned three days prior that was related to a criminal matter. According to LTC Paul, on April 2, 2014 you called him and advised that on March 30, 2014, a person with whom you maintained a relationship since March 2013, told you that he had firsthand information related to two homicides that were under investigation by NOPD.‘ You told LTC Paul that thé person, later identified as Frank Mike, Jr., informed yoh that he drove the van, implicated in the homicides of the Joseph couple from Reserve, from New Orleans to Atlanta, Georgia. You did not report this information to anyone in your chain of command nor law enforcement for over two days, until you reported it to LTC Paul on April 2, 2014.
As a result of your conversation with LTC Paul, criminal and administrative investigations were opened into your conduct. According to information you provided to Louisiana State Police CID investigators, NOPD investigators and Internal Affairs investigators, you were aware that Frank Mike, Jr. was a convicted felon during your *766 relationship with him and despite this knowledge, you continued a friendly relationship. Although you ended the sexual aspect of your relationship after you learned' that Frank Mike, Jr. served a fourteen year sentence for a narcotics charge, you continued to talk on the phone, text, shared meals, attend[ed] a concert, and even had a couples’ massage with him. Despite knowledge that he had served a 14 year sentence, you failed to look any further into his criminal activity and you went so far as to provide him personal access to LSP reserved parking near the Smoothie King Arena in New Orleans and you transported him, at least once, in your LSP assigned vehicle, despite your knowledge of his serious criminal history.
[[Image here]]
According to you, you learned of Frank Mike, Jr.’s involvement in the disposal of the Joseph van after midnight on March 31, 2014. You did not report it to either criminal investigators or your chain of command until April 2, 2014. Your regular duty hours on March 31, 2014, were 0600 to 1630 hours. On March 31, 2014, you entered Benson Towers at approximately 0649 hours according to your access card record, and you did nothing to report what you knew about the homicide investigation related to the Josephs. According to your statement, you confirmed the story Frank Mike, Jr. told you about the murdered Reserve couple on the internet on March 31, 2014. You claim to have been in "shock,” yet you texted .with Frank Mike, Jr. several times during the day and neither of you mentioned reporting the information to authorities.
On the morning of April 1, 2014, again you reported to duty and did nothing to report what you knew about Frank Mike, Jr.’s involvement in the disappearance and murders of the Joseph couple. That night, you met with Frank Mike, Jr. and did nothing to turn him into authorities. Instead, according to your statement, you gave him an ultimatum that he turn himself in to authorities. On the morning of April 2, 2014, you finally notified LTC Paul about your dilemma, after which, you notified LSP Criminal Investigations Division about the information you learned related to the Joseph homicides.
On April 11, 2014, you were placed on Administrative Leave Pending Investigation. On that date, Captain David McClen-don of Internal Affairs advised that you were prohibited from communicating with anyone about the facts surrounding the investigation. On April 15, 2014 at 1045 hours, Lt. Marcelle and Sergeant Saleem El-Amin delivered letters notifying you of your Administrative Leave and the Administrative Investigation. The Administrative Investigation letter again ordered that you refrain from discussing the investigation, or any facts related thereto, with anyone. Despite these orders, which you acknowledged receiving in your interview with IA, on the afternoon of April 15, 2014, you telephoned former LSP Lieutenant Colonel, and now, U.S. Marshal Genny May, to discuss your predicament. (Footnotes omitted.)

. This response, rather than mitigating the delay in reporting, indicates that Ms. Brown’s relationship with Mike impaired her professional judgment.