ON REHEARING GRANTED

PAUL A. BONIN, Judge.
| Robert Evangelist, a New Orleans police officer, appealed his termination by the Superintendent of Police, Warren Riley, to the New Orleans Civil Service Commission. The Commission denied his appeal. He then filed an appeal in this court. We reversed that denial and we rendered judgment in Mr. Evangelist’s favor. Upon the timely application of the appointing authority, we granted rehearing in this matter in order to consider video evidence which was inaccessible to us at the time we first decided this appeal. Having now accessed the video evidence, and after allowing the parties additional briefs and oral argument, for the reasons which follow, we reverse the decision of the Commission.
I
When counsel for the parties initially appeared for oral argument, the panel judges advised them that, except for a very limited and irrelevant segment, the video evidence referenced in the transcript and in their briefs was not a part of the record in this court. They were cautioned at that time to investigate the absence of the video evidence. After a reasonable period of time passed and there was no J_gCommunication from counsel about what appeared to be important evidence missing from the record, the original decision was rendered. Upon its receipt of the decision, the Commission informally communicated with the court, reviewed the submission of evidence, and informed the court of special, proprietary procedures necessary to access the relevant portion of the video evidence.
Later, counsel for the parties in their briefs explained their post-argument silence as having exclusively relied upon assurances from the Commission that all evidence had been transmitted to the court. In any event, the Department of Police timely requested rehearing, which the court immediately granted so that it could access the video evidence upon which the Commission primarily relied for its decision to uphold the appointing authority’s action.
In order to avoid a re-occurrence of the problems associated with evidence which may be technologically “hidden” from access by the court, the court en banc has adopted the Local Rule 14, effective February 1, 2010, which provides:
LOCAL RULE 14 Electronic Audio and Video Evidence
1. All electronic audio and video evidence submitted to the Court shall be in the Windows Media Audio (WMA) or Windows Media Video (WMV) format to ensure that the evidence can be played on the default Windows Media Player.
2. In the event that audio or video evidence cannot be converted to the re *837 quired formats, the software or codec required to view the evidence must be provided. This must include a description of the software or codec and instructions on how to install and use the software. Counsel for the parties must also inform the clerk of court in writing of these circumstances within five (5) days of the lodging of the record.
|s3. The following information must be provided with all submitted electronic evidence:
Title of file
Brief description of what is contained in the file
Length of file
Number of files
File format
Guarantee of no virus
The antivirus software that was used to scan the files and the date of the virus definitions
It is the exclusive responsibility of counsel for all parties to ensure that all electronic audio and video evidence works properly before submitting it to the Court.
II
Mr. Evangelist was a classified employee with permanent status in the New Orleans civil service system. He had been employed as a police officer since March 16, 2003, and was designated as a Police Officer I. On the evening of October 8, 2005, he and his fellow officer Lance Schilling were on foot patrol duty in the French Quarter of New Orleans, on Bourbon Street, near the corner of Conti Street. Two mounted policemen were nearby in the street. A post-Hurricane Katrina curfew remained in effect for the city struggling to return to normal business and activity in the French Quarter and elsewhere, after the storm and flooding.
Robert Davis, a visitor to the city, approached the rear of one of the police horses, a charged conversation between him and the police officers erupted, and Mr. Davis touched Mr. Evangelist’s chest. Mr. Evangelist and Mr. Schilling attempted to subdue and handcuff Mr. Davis, who clutched the iron grillwork on a storefront to resist being handcuffed. Two unidentified FBI agents entered the | 4struggle, and one of them brought Mr. Davis to the sidewalk,[1] causing Mr. Davis’ head to strike the pavement, sustaining injury. Eventually Mr. Davis was restrained and, handcuffed, placed in an EMS ambulance called to the scene to handle the head injury, which had stopped bleeding before the ambulance arrived. An EMT evaluated Mr. Davis, who was found to be alert, oriented and awake. Mr. Davis was subsequently taken to the temporary site for handling arrestees, the Greyhound Station, for booking.
The encounter occurred about six weeks after Hurricane Katrina. Mr. Davis testified that he was in New Orleans to check on his property. He had ventured from his hotel room near the perimeter of the French Quarter in search of cigarettes. Parts of the encounter between the officers and Mr. Davis were captured on videotape, possibly by more than one source, and were broadcast locally and nationally. At least a portion of the video recording was filed into evidence with the Commission.
An internal investigation was initiated by the Public Integrity Bureau of the police department. Following the investiga *838 tion, a departmental hearing was conducted by a deputy superintendent. On December 21, 2005, immediately upon the conclusion of the hearing, Superintendent Riley, the appointing authority, issued to Mr. Evangelist a letter of termination, which specified the charge on which the termination was based.
15Mr. Evangelist appealed his termination to the New Orleans Civil Service Commission. A referee, assigned by the Commission, conducted an evidentiary hearing and issued a report recommending to the Commission that the appeal be granted because the appointing authority failed to prove the charges against Mr. Evangelist. The Commission did not conduct any further hearings, but, on August 27, 2008, rendered its decision denying the appeal. It is from that decision that Mr. Evangelist appeals to this court.
Ill
“No person who has gained permanent status in the classified ... city service shall be subjected to disciplinary action except for cause expressed in writing.” La. Const., art. X, § 8(A); La. Const. art. X, § 1(B). New Orleans police officers are included in the protection guaranteed by this provision. Walters v. Dept. of Police of New Orleans, 454 So.2d 106, 112 (La.1984). “Legal cause exists whenever an employee’s conduct impairs the efficiency of the public service in which the employee is engaged.” Cittadino v. Dept. of Police, 558 So.2d 1311, 1315 (La.App. 4th Cir.1990).
The U.S. Supreme Court considers this type of tenured civil service employment to be a property right which is protected by the Due Process Clause of the U.S. Constitution. The Supreme Court in Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 582, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), held:
The essential requirements of due process ... are notice and an opportunity to respond.... The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer’s evidence, and an opportunity to present his side of the story, (emphasis added)
1 fiFurther, the Loudermill Court explained: “the point is straightforward: the Due Process Clause provides that certain substantive rights — life, liberty, and property — cannot be deprived except pursuant to constitutionally adequate procedures ... the right to due process ‘is conferred not by legislative grace but constitutional guarantee.’ [citation omitted].” Id. at 541.
It is a basic precept of our system of justice, fair play, and due process that one accused — of a crime, an administrative breach of conduct or code violation, or a civil tort — be given notice of that which he or she is alleged to have done or failed to have done. Thus our jurisprudence has required that written notice be given to a public employee. See La. Const. art. X, § 8; Williams v. Dept. of Property Mgmt., 02-1407, p. 2 (La.App. 4 Cir. 4/16/03), 846 So.2d 102, 104; Riggins v. Dept. of Sanitation, 92-1921 (La.App. 4th Cir.1993), 617 So.2d 112. Importantly, we emphasize that in Webb v. Dept, of Safety & Permits we held that “notice of the charges should fully describe the conduct complained of ... to enable [the employee] ... to fully answer and prepare a defense.” Id., 543 So.2d 582, 584 (La.App. 4th Cir.1989) (citing Robbins v. New Orleans Public Library, 208 So.2d 25, 28 (La.App. 4th Cir.1968)) (emphasis added).
A civil service employee cannot be charged with conduct specifically described in the written charge and then be expected, much less required, to defend conduct which was not described or conduct which *839 is different from that which was described. In Williams v. Dept, of Property Mgmt. the City terminated a motor vehicle examiner on the basis of her alleged alteration of her time card for one day. After the hearing, incidents of payroll fraud on two other days were discovered, and Williams was terminated. The termination letter listed three separate occasions of payroll fraud. We stated:
17Since the Department of Property Management used these other two incidents of payroll fraud to reach its decision to terminate plaintiffs employment, the plaintiff was entitled to notice of these additional charges and an opportunity to present a defense in regards[sic] to these additional charges. The requirements of La. Const. Art. 10 § 8 and Loudemiill were not met.
Id. at p. 5, 846 So.2d 102 at 105 (emphasis added).
In the case at bar, on the day of the departmental hearing, the appointing authority issued a letter sustaining the charges[2] and terminating Mr. Evangelist.[3] The appointing authority’s charging letter, which is the requisite constitutional basis for subjecting Mr. Evangelist to any disciplinary action “for cause expressed in writing” under La. Const., art. X, § 8(A), accused Mr. Evangelist of the following specifically described conduct:
... on or about October 8, 2005, you were involved in a physical altercation with Mr. Robert Davis. A video of the incident captured you striking Mr. Davis in the torso while he was lying on the ground with three other police officers holding him down, (emphasis added)
The purpose of requiring the specific description of the conduct which the appointing authority deems deserving of disciplinary action is to permit the employee to know precisely which conduct he or she must defend before the Commission.
Mr. Evangelist timely exercised his constitutional right to an appeal from the appointing authority’s disciplinary action to the New Orleans Civil Service Commission. La. Const., art. X, § 8(A). The Commission has “the exclusive power and authority to hear and decide all removal and disciplinary cases ...” La. Const., art. X, § 12(B); Pope v. New Orleans Police Dept., 04-1888 (La.App. 4 Cir. 4/20/05), 903 So.2d 1. Before the Commission, “the burden of proof on appeal, as to the facts, shall be on the appointing authority.” La. Const., Art. X, § 8(A) (emphasis added); Walters, supra, at 112-13. “The appointing authority must prove by a preponderance of the evidence the occurrence of the complained of activity and that the conduct impaired the efficient operation of the public service. Newman v. Dept. of Fire, 425 So.2d 753, 754 (La.1983); Cittadino, 558 So.2d at 1315 (La.App. 4 Cir.1990).” Barquet v. Dept. of Welfare, 620 So.2d 501, 505 (La.App. 4th Cir.1993) (emphasis added); [4] Cure v. Dept. of Police, 07-0166, p. 2 *840 (La.App. 4 Cir. 8/1/07), 964 So.2d 1093, 1094, citing Marziale v. Dept. of Police, 06-0459, p. 10 (La.App. 4 Cir. 11/8/06), 944 So.2d 760, 767. The corollary is that the appointing authority is not permitted to substitute proof before the Commission of the occurrence of some uncomplained-of activity.
The Commission assigned the appeal to its referee: “[The Commission] may appoint a referee to take testimony, with subpoena power and power to administer oaths to witnesses.” La. Const., art. X, § 12(B). After hearing testimony and considering other evidence, the referee issued a written report on February 25, 2008, which concluded: “The appointing authority has failed to meet its burden of proof that the Appellant violated any internal rule. Based on the foregoing, the appeal should be granted.”
Other than the evidentiary proceeding before its referee, the Commission did not conduct any further evidentiary hearings. On August 27, 2008, the Commission rendered its decision denying the appeal of Mr. Evangelist from the appointing 19authority’s termination of him as well as the ten-day suspension for violation of professionalism. Mr. Evangelist then timely appealed to this court.
The Commission’s decision is subject to appellate review on any question of law or fact, determining if its order was arbitrary, capricious, or characterized by an abuse of discretion. La. Const. Art. Art., § 12(B); Barquet, 620 So.2d at 505; Cure, 07-0166 at p. 2, 964 So.2d at 1095; Walters, 454 So.2d 106, 114 (La.App. 4th Cir.1984). When there is no rational basis for the Civil Service Commission’s action, its decision is arbitrary and capricious. Bannister v. Dept. of Streets, 95-0404, p. 8 (La.1/16/96), 666 So.2d 641, 647.
The judicial review function in a matter appealed from a civil service commission is “multifaceted,” Walters, supra at 113-14:
In reviewing the commission’s procedural decisions and interpretations of law the court performs its traditional plenary functions of insuring procedural rectitude and reviewing questions of law. Due concern both for the intention of the constitution and for the boundaries between the functions of the commission and of the court, however, demands that a reviewing court exercise other aspects of its review function with more circumspection. In reviewing the commission’s findings of fact, the court should not reverse or modify such a finding unless it is clearly wrong or manifestly erroneous. In judging the commission’s exercise of its discretion in determining whether the disciplinary action is based on legal cause and the punishment is commensurate with the infraction, the court should not modify the commission’s order unless it is arbitrary, capricious, or characterized by abuse of discretion. R.S. 49:964; Save Ourselves, Inc. v. The La. Environmental Control Comm., 452 So.2d 1152 (La.1984); Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (D.C.Cir.1978); K. Davis, Administrative Law (1982 Supp.) at 536 et seq.
IV
The evidentiary hearing conducted before the Commission’s referee provides the opportunity for the appointing authority to prove its case as set out in its charging letter against the police officer and for the police officer to answer and 1defend those charges. In our original opinion we set forth in detail the testimony of the witnesses.
*841 Before addressing the testimony and the exhibits, including the now accessible video, we first address the matter of the Commission’s factual finding that Mr. Evangelist was attempting to effect an unlawful arrest of Mr. Davis:
“There is no evidence in the record that Mr. Davis was breaking any law, a suspect for any crime, disturbing the peace or threatening anyone. There is no evidence that he had been drinking ... the possibility that he was carrying a concealed weapon was minimal.”
Of course, if this finding is correct and justified, almost any force used by a police officer upon a citizen would be excessive and unreasonable and deserving of discipline. A person does, of course, have a right to resist an unlawful arrest. See, White v. Morris, 845 So.2d 461 (La.1977); State v. McCoy, 546 So.2d 240 (La.App. 2 Cir.1989). But the appointing authority never accused Mr. Evangelist of attempting an unlawful arrest of Mr. Davis, and it most assuredly did not attempt to establish facts which would support such a factual finding by the Commission. Mr. Evangelist, not having been accused by the appointing authority of making an unlawful arrest, was not required to introduce evidence before the Commission to establish that the arrest was lawful, and, of course, he did not.
Mr. Evangelist was in uniform and Mr. Davis knew he was a police officer. Sgt. Gay, who conducted the internal investigation on behalf of the NOPD, acknowledged that Mr. Davis was resisting the four officers trying to handcuff him, and that Mr. Evangelist was authorized to use force to accomplish a lawful arrest. The NOPD Operations Manual, Chapter 1.13, “Policy on the Use of Force,” set forth the applicable standard: “Police Officers shall use only that force reasonably necessary to effectively bring an incident under control, while Inprotecting the lives of citizens and officers.” (emphasis added) Police instructors Najolia and Schindler both considered the detention to be lawful and use of force to be appropriate based on the noncompliance of Mr. Davis in his resistance to being handcuffed. On this evidence, no reasonable factfinder could, or should, conclude that Mr. Davis’ arrest was unlawful. The Commission’s finding of fact that Mr. Davis’ arrest was unlawful is clearly wrong.
La. R.S. 14:108 makes it unlawful to resist a police officer when the person knows that the police officer, in his official capacity, is arresting him. Further, La. C. Cr. P. art. 220 provides:
A person shall submit peaceably to a lawful arrest. The person making a lawful arrest may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained.
Mr. Davis was not entitled to resist Mr. Evangelist or any of the other law enforcement officers, and Mr. Evangelist was entitled to use “reasonable force” to effect Mr. Davis’ arrest.
The Commission erred when it evaluated Mr. Evangelist’s use of force as if he were effecting an unlawful arrest.
V
We turn now to the evidence before the Commission to determine whether the decision of the Commission, unlike that of its own referee who actually heard the witnesses and observed them while they described the scenes in the videos, was arbitrary, capricious or characterized by abuse of discretion in finding that the appointing authority proved its charges by a preponderance of the evidence. In discharging our responsibilities in reviewing the decision of the Commission, we focus on evi *842 dence which supports the charges which Mr. Evangelist prepared to 112defend against. We cannot consider conduct which has not been charged as an independent basis to uphold either the Appointing authority’s action or the Commission’s decision. So we return to the specific allegation of misconduct as charged in writing:
... on or about October 8, 2005, you were involved in a physical altercation with Mr. Robert Davis. A video of the incident captured you striking Mr. Davis in the torso while he was lying on the ground with three other police officers holding him down, (emphasis added)
In our original opinion we observed the overwhelming absence of testimony from numerous eyewitnesses, with the exception of Mr. Evangelist and Mr. Davis. Thus, considerable testimony consists of the witnesses interpreting the video evidence. That interpretative testimony was described in detail in our original opinion. The testimony of Sgt. Gay, the investigator from the Public Integrity Bureau of the New Orleans Police Department, is illustrative of what was seen on one video:
... Officers Evangelist and Schilling affecting [sic] the arrest on Mr. Davis. During that video it shows Officer Evangelist punching Mr. Davis four times to the left side of his head. Also, the video shows that Mr. Davis is taken to the ground at which point he begins to bleed, and he’s allowed to stay on the ground, I think approximately four minutes and twenty-two seconds, according to the video, bleeding until EMS arrives on the scene.
Another video is further interpreted by the sergeant: “This one is starting off after the incident is almost over. Right now he is laying[sic] on the ground handcuffed.”
Okay. Again, you see Officer Schilling punching Mr. Davis ... The guy with the black shirt on is an FBI agent. The other guy with ... the cap on ... That’s Officer Evangelist. And you can see he kneed him a couple of times and then punched him right there while he was on the ground.... And he’s going to punch him again ... that’s pretty much the extent of it.
| lsNotably, Sgt. Gay’s interpretative testimony is not focused on the conduct described in the charging letter. He is describing conduct by Mr. Evangelist of “punching Mr. Davis four times to the left side of his head.” Our review of the video evidence reveals that this is uncharged conduct, which Mr. Evangelist was not put on notice to defend. The punches to the head area which are observable in the video evidence all occurred while Mr. Davis was standing, before he was brought to the ground by two agents of the Federal Bureau of Investigation who intervened to assist the arresting officers. It is undisputed that it was the action of the FBI agents, not Mr. Evangelist, which resulted in any bleeding. Superintendent Riley did not find objectionable the conduct of Mr. Evangelist while Mr. Davis was standing and did not charge him with violating departmental rules for that conduct. The superintendent never viewed the video evidence during the hearing before the referee.
The charged conduct was confined to Mr. Evangelist’s actions after Mr. Davis was brought to the ground.
Sgt. Donald Harris, an instructor in the use of force at the NOPD training academy, who also viewed the video evidence during the hearing, testified that Mr. Evangelist acted within the force continuum if (as he was charged) he punched Mr. Davis in the torso to force compliance. Sgt. Harris described shoulders, arms and legs as appropriate areas for a strike with hard hands. According to Sgt. Harris, *843 strikes to those areas are calculated to get the subject’s arms to relax to facilitate compliance with a police officer’s attempt to handcuff.” Sgt. Harris interpreted his view of one of the videos:
That was Officer Evangelist to the back — his back was to me throwing punches. It looked to me like head strikes. However, there is a technique that we teach, again with the |14closed fist, for the muscle to relax on the back of the — sort of the shoulder blade that we teach, a strike to part of the whole what’s called the brachial plexus tie-in to weaken the arm so that the officer can bring it to — take it to the back and handcuff the person.
And later he stated:
Then if they [the blows] were to the back, I mean, it looked like — I mean, that’s what it looked like to me. But we would teach that there was a blow that an officer could strike to the back, again around the shoulder blade area.”
If it were concluded that the blow was to the back or around the shoulder blade, Sgt. Harris testified that such a blow would be “acceptable.” Further, he noted that from his review of the video, when Davis was positioned on the pavement, no strikes were thrown at him. Likewise, responding to a question from the referee if it was appropriate “to use his knee to force his arm behind his back?”, Sgt. Gay replied, “If that was what he was doing and that needed to be done at that point, yeah.” Also, in response to the referee, who was relating the evidence to the written charge, Sgt. Gay stated that if Mr. Evangelist punched the suspect on the side of the torso to force the person to react in order to reposition the suspect’s arm, such would be “absolutely” acceptable use of force.
Not only were the witnesses offered by the appointing authority in agreement that the conduct as described in the charging letter would not constitute excessive or unauthorized use of force, but expert witnesses offered by Mr. Evangelist to help him defend the written charges agreed that the charged conduct was neither excessive nor unauthorized. Dr. Wade Schindler testified that:
What I observed, and in also talking to Officer Evangelist what I observed was about five minutes of a struggle. It’s very, very unusual for police to be involved in a struggle like that over that length of time. There’s always this interaction between the person to be arrested and the officers. Usually, that takes place within a few | ^seconds or maybe a little bit more and then it’s over, there’s compliance.
What I saw here was about five minutes of non-compliance. I saw four police officers, two federal, two local, attempting to get compliance. And at no time, until the very end, were they able to get Mr. Davis to comply with the request.... I did not see any voluntary compliance.
Dr. Schindler expressed his opinion that Mr. Evangelist acted appropriately in conformity with his training and NOPD rules on use of force. The blows to Mr. Davis’ torso were appropriate and calculated to make him comply with handcuffing. Striking an arrestee in the area “below the earlobe and down to the bottom of the neck ... is authorized under the training that they had.” When asked, “Were any of the blows that you saw Officer Evangelist administer improper or inconsistent with his training?” Dr. Schindler replied, “No.” “He did it exactly as it is taught.”
Major Kerry Najolia, Director of Training at the Jefferson Parish Sheriffs Office Training Academy and a certified POST instructor and expert in “force continuum” *844 (the protocol or escalation of methods and devices to subdue opponents with appropriate force — from a wave-over to a taser) testified that Mr. Evangelist acted within protocols for subduing a noncompliant adversary. “Clearly my belief in watching the video is that Officer Evangelist ... clearly had sufficient cause to escalate more quickly than he did in this situation.” Major Najolia stated:
[Pjolice officers are absolutely trained that they can punch, kick, elbow, knee to the entire body area.... And, basically what Officer Evangelist and Officer Shilling utilized was techniques that were directed to soft tissue areas. Areas that were on the lower level in the lower region of the target zones.
He considered a kick prior to Mr. Davis’ being handcuffed to be appropriate: “[Ujntil those hands are placed behind his back and the handcuffs are secured, then | ificlearly there is a tremendous danger and risk to the officer’s safety and the other innocent people in that area.” When asked “Did you see any force employed by Mr. Evangelist after the threat had been neutralized or after Mr. Evangelist had him under control in the handcuffs?” Major Najolia replied,
There was a touching of ... Mr. Davis’ shoulder area on a couple of occasions, and it could be two or three times when it appeared that Mr. Davis was, in fact, attempting to sit up. It appeared to me, and based on what Officer Evangelist told me, he was just ... basically just trying to keep Mr. Davis in a position where he would no longer be a significant danger or in a position where he could injure himself.
Asked if these actions were appropriate, Major Najolia replied, “Certainly,” stating:
Once Mr. Davis is walking and placed against the wall, clearly it was evident to me that both Officer Evangelist and Officer Schilling were doing everything that they possibly could to get Mr. Davis’ hands behind his back so that they could apply handcuffs. Based on the fact that they could not get those hands behind his back, it was because of his resistance and aggressive movements away to prevent them from putting his hands behind his back, so that clearly is resistance in my opinion and aggression.
Neither of these experts interpreted the video evidence as supporting the charged conduct.
The' Commission’s referee, after he heard live testimony, viewed images including those depictions, and reviewed the trial transcript testimony entered in evidence at the hearing, in his report to the Commission, observed of a video image, “[I]t’s difficult to tell from that angle” where blows to Mr. Davis landed, and went on to state:
Well, I don’t think the issue is where the blows landed, because it has already been determined that the blows were not to the head. I mean, the disciplinary letter says it was to the torso. Granted, it’s difficult to tell from that angle, but that’s what the conclusion was.
|17Mindful of the appointing authority’s charges against Mr. Evangelist, the referee concluded: “Based upon the overwhelming evidence the Appellant reasonably complied with the use of force continuum” and “the appointing authority has failed to meet the burden of proof that the Appellant violated any internal rule.”
VI
Although the referee reported and recommended to the Commission that Mr. *845 Evangelist’s appeal should be granted,[5] the Commission denied the appeal, basing its decision largely on its evaluation of the video evidence:
Important evidence in this case is a videotape of the incident taken by a pedestrian on Bourbon Street.... A portion of the videotape, agreed to by all counsel, was introduced into evidence. It provides a more accurate account of the incident than the simplistic versions testified to by Mr. Davis and [Mr. Evangelist], both of which we take with a grain of salt. To this observer the videotape shows ... Mr. Davis is seen on the pavement facing upwards with [Mr. Evangelist] crouching beside him. [Mr. Evangelist] strikes Mr. Davis at least twice in his head area at a time when Mr. Davis appears immobilized and offering little resistance.
(emphasis in original).
The Commission decision further stated:
The videotape shows that at the time Appellant struck Mr. Davis four times, two of which were in his head area while he was lying on the pavement, he was physically restrained by four police officers and there was no necessity to take such violent action particularly since Mr. Davis offered to voluntarily turn over for the purpose of permitting the handcuffs to be attached.
(emphasis added).
11sLike the referee’s and unlike the Commission’s, our own review of the video evidence, which may not constitute all of the videos in the public domain, coupled with the consistent opinions of the experts offered by both the appointing authority and the civil service employee, compels us to conclude that there are no blows, punches, hits, or strikes by Mr. Evangelist to Mr. Davis’s torso area after he was down on the ground which exceeded Mr. Evangelist’s authority as a New Orleans police officer.
As suggested by the referee’s own comments while he viewed the video evidence in the presence of the expert witnesses, reasonable persons may well disagree about what conduct is captured by the camera. And if that were the only issue for our review, it is clear that we would defer to and accept the Commission’s reasonable view of the video evidence. But that is not the case before us.
The Commission’s decision cannot rest on a factual finding that the appointing authority did not charge and that the civil service employee had no notice to prepare to defend against. The Commission cannot uphold the appointing authority by finding that it proved uncharged conduct. By basing its decision upon uncharged and undefended conduct, the Commission erred as a matter of law. *846 Its decision violates Mr. Evangelist’s due process rights. We reiterate what the United States Supreme Court has instructed:
The essential requirements of due process ... are notice and an opportunity to respond.... The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer’s evidence, and am, opportunity to present his side of the story, (emphasis added)
Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). “[T]he right to due process ‘is conferred not by legislative grace but constitutional guarantee.’ [citation omitted].” Id. at 541.
119In exercising our multi-faceted review function under Walters, we first conclude that the Commission, as we have explained, was clearly wrong in its factual finding that Mr. Evangelist was effecting an unlawful arrest of Mr. Davis. The correct finding is that Mr. Davis was resisting a lawful arrest by Mr. Evangelist, who was authorized to use reasonable force in making the arrest. We next conclude that the Commission exceeded its own authority in basing its decision upon a finding of fact (i.e. blows to the head) which had not been charged by the appointing authority. The Commission was obliged to determine whether the appointing authority had proved what it had charged and what Mr. Evangelist had defended. Although the Commission could have reasonably concluded that the Appointing Authority did prove by a preponderance of the evidence that Mr. Evangelist struck “Mr. Davis in the torso while he was lying on the ground with three other police officers holding him down,” we further conclude that from the totality of the evidence, including the unanimous opinion evidence of the experts who testified for both parties, that such force does not constitute “unauthorized force” under the circumstances. The Commission could not reasonably disregard the opinion testimony. Had the Commission confined itself to a determination of whether the appointing authority proved by a preponderance of the evidence that Mr. Evangelist’s striking Mr. Davis’s torso constituted the use of excessive and unauthorized force, it is clear that it would have necessarily found that the appointing authority had not proved that the complained of activity or dereliction by Mr. Evangelist occurred. See Cittadino, 558 So.2d at 1315 (La.App. 4 Cir.1990).
|2pWe conclude, therefore, that there is no rational basis for the Commission’s determination that there was legal cause for Mr. Evangelist’s removal from the civil service as well as the related discipline.
DECREE
We reverse the ruling of the New Orleans Civil Service Commission. Robert Evangelist is to be restored to his New Orleans Police Department rank as of October 8, 2005, and all benefits, seniority standing, and salary are to be reinstated as of that date.
REVERSED AND RENDERED.

. Davis testified that the FBI officer forced him to the ground and placed him in a choke-hold.

.Mr. Evangelist was charged pre-termination with violations of failing to adhere to the law, including simple battery, the use of unauthorized force, and professionalism. All of these charges were sustained by the departmental hearing. An additional charge of violation of truthfulness was added to the letter by Supt. Riley. The Civil Service Commission rejected this additional charge, and the police department has not appealed.

. The other discipline imposed in the letter was 60-day suspension for the sustained violation of truthfulness and 10-day suspension for the sustained violation of professionalism. These periods were credited against the period of time he had served on his emergency suspension pending the departmental termination hearing.

. There is no issue that if Mr. Evangelist used unauthorized force on Mr. Davis that such *840 misconduct would impair the efficient operation of the service.

. Current jurisprudence suggests that the decision-making authority of a referee of the New Orleans civil service commission, as contrasted with the state civil service commission, has not been squarely addressed. See La. Const. Article X, § 12(B) as contrasted with § 12(A); also see, McGee v. Sewerage & Water Bd. of New Orleans, 396 So.2d 430, 432 (La.App. 4th Cir.1981) ("For the purposes of appellate review we consider the report as advisory to the Commission and in no other light.”), which preceded the amendments to the constitution which expressly authorized the appointment of referees by the respective commissions, and Morgan v. Chief Administrative Office, 455 So.2d 1242, 1244 (La.App. 4th Cir.1984), which applied the post-amendment article, ("a hearing examiner is appointed 'to take testimony and has no decisional authority.’ [citations omitted]”). But see, Blappert v. Dept. of Police, 94-1284 (La.App. 4 Cir. 12/15/94), 647 So.2d 1339, 1342 ("The factual findings of the referee will not be set aside unless they are manifestly erroneous.”) Our review of the record evidence in this case coincides with (hat of the report of the referee.