JOAN BERNARD ARMSTRONG, Chief Judge.
|2Yolanda Smith prosecutes this appeal from the judgment of the Civil Service Commission, City of New Orleans (CSC). Ms. Smith has permanent status as a police dispatcher with the New Orleans Police Department (NOPD). She has been employed by the City of New Orleans since 1978 and by the NOPD since 1984, when she began her service as a complaint operator. In 1994, she was promoted to her present position. Ms. Smith was charged with failing to report for duty during the emergency activation of personnel caused by the approach of Hurricane Gustav in August of 2008. Following an NOPD investigation, she was advised that violations of two NOPD rules were sustained. NOPD, by letter from Superintendent Warren Riley, suspended Ms. Smith for ten working days for her sustained violation of Rule 4: Performance of Duty, paragraph 1 — Reporting for Duty pursuant to Hurricane Gustav activation orders. The letter from Superintendent Riley also notified Ms. Smith that she was terminated for her sustained violation of Rule 4: Performance of Duty, paragraph 2 — Instructions from an Authoritative Source: Hurricane Gustav activation orders instructed by the ^Superintendent of Police; and the Communications Division Standard Operations Procedures Manual (Policy 81.18, NOPD, Specifics: 5. Alert Level One).
Ms. Smith appealed her suspension and termination to the CSC, and her appeal was heard on August 20, 2009, before Hearing Examiner Jay Ginsberg. Ms. Smith, NOPD investigator Gesielle Rous-sel, NOPD Sergeant Claude A. Flot, Jr., and NOPD Chief Lawrence Weathersby testified at the hearing.
Ms. Smith testified that she understood that as a police communications dispatcher, she is part of the designated essential personnel for the City of New Orleans, and was required to appear for work when emergency activation orders were in effect. She admitted that she was notified of the activation of first responders for Hurricane Gustav, but did not report as required on Sunday, August 31, 2008. Ms. Smith testified that she was in Monroe, Louisiana when she was called in to work. She had worked the day before with a headache, and left New Orleans because she did not have a cell phone and did not know if she was going to be safe remaining at home alone. She claimed that she did not want to be alone in case she needed medical help. When she ultimately went to a doctor, on September 10, 2008, she was told that she had hypertension and diabetes.
Ms. Smith admitted that she had been notified of NOPD Policy 81.13 regarding level one alerts. Part of the notification included the requirements that she prepare in advance for any evacuation needs of her dependents or others who relied on her, and be prepared to come in and work twelve-hour shifts during such an alert. She admitted that she signed a property cognizance form stating that she 14read and understood the policy. She acknowledged that although she had received and understood the policy, and received specific instruction to report for duty on August 31, 2008, she failed to follow or comply with the instructions.
*816 Ms. Smith testified that she remained in Monroe until Wednesday or Thursday (September 2 or 3, 2008), when she returned to New Orleans. She said that she tried without success to locate her doctor. She ultimately sought medical advice on September 10, 2008 at a “walk-in clinic”, where she was seen by a doctor who provided her an NOPD Form 50 certifícate dated that day, indicating a current diagnosis of diabetes mellitus and borderline hypertension. The doctor noted that these conditions caused Ms. Smith to have a headache. The doctor certified that she was able to return to full duty on September 10, 2008.
Ms. Roussel testified that, in her position as an Assistant Police Communications Supervisor in the NOPD’s Communications Division, she investigated the incident concerning Ms. Smith’s failure to appear during the Hurricane Gustav emergency activation. She sustained Ms. Smith’s violation of NOPD Rule 4, Paragraph 1:
“A member shall promptly report for duty at the time and place required by assignment or orders. But in the event of inability to perform or to begin punctually, he shall notify his commanding officer or a member of his unit authorized to receive such information before the designated time for commencement.”
She also sustained Ms. Smith’s violation of NOPD Rule 4, Paragraph 2, Instructions from Authoritative Source, to wit: Hurricane Gustav, activation orders. The basis for this charge was that Ms. Roussel received orders from Captain |5B urcett to notify and advise her subordinate staff that the Chief of NOPD had activated for the hurricane pursuant to Policy 81.18. The alert level for the hurricane emergency was Alert Level One, the highest level. She so advised Ms. Smith, who did not report for duty until September 10, 2008.
Ms. Roussel identified City Exhibit 4, relating to Alert Level One, which provides, inter alia:
SICK LEAVE
An employee reporting sick within forty-eight hours of the activation of any alert level shall:
1. Document the illness with a Form 50.
2. Notify the Branch Director over the Office of Compliance of the illness and estimated date of return.
3. Notify his/her immediate supervisor of their [sic] illness and estimated date of return.
4. If instructed by a supervisor, report to the police physician for an examination.
5. Follow all procedures for requesting and remaining on sick leave.
Ms. Roussel testified that this policy was applicable to Ms. Smith. Ms. Roussel identified City Exhibit 2, the Form 50 provided by Ms. Smith’s doctor. Ms. Smith provided the form on September 10, 2008, eight days after the forty-eight hour time limit set by the policy.
Ms. Roussel identified City Exhibit 3, a transcription of a taped telephone call Ms. Smith made to Ms. Roussel on August 31, 2008. The transcription reads in relevant part:
APCS Roussel: Command Desk.
PD Smith: Um, this is Yolanda Smith calling.
APCS Roussel: Yes.
PD Smith: ... sick.
APCS Roussel: You calling in sick.
PD Smith: Yeah.
[[Image here]]
APCS Roussel: What is your illness?
PD Smith: I have a headache.
*817 |rTAPCS Roussel: Okay, do you know when you are coming back?
PD Smith: No, I don’t know when I am coming back.
APCS Roussel: Okay via Sgt. Flot he needs you to come in and turn in your ID in [sic] ...
PD Smith: Uh huh.
APCS Roussel: And you need a Form 50.
PD Smith: Uh huh.
APCS Roussel: To return but he needs you to turn in your ID.
PD Smith: Okay and alright.
APCS Roussel: Okay and do you know when you
PD Smith: But listen.
APCS Roussel: Uh huh.
PD Smith: I am not in New Orleans.
APCS Roussel: Okay one moment— where are you?
PD Smith: I’m in Monroe.
APCS Roussel: She not, she’s not in [pause] Okay when you do return you have to return with Form 50.
PD Smith: That’s fíne.
APCS Roussel: And um and if you can report we need you to report to the Convention Center.
PD Smith: Okay alright I will be able to reach y’all at this number.
APCS Roussel: Hold on a minute, okay, no, you can’t report to the Convention Center. You will have to report to Hammond, Louisiana, and you need to report to Captain Thomas and you need to take this address down.
[[Image here]]
APCS Roussel: It’s 601 West Coleman Avenue
[[Image here]]
APCS Roussel: Hammond, Louisiana
PD Smith: Houma.
APCS Roussel: Hammond.
PD Smith: Hammond, Louisiana.
APCS Roussel: And you need to report to Captain John Thomas ... [phone number]
[[Image here]]
APCS Roussel: Yes and what is the address where you are in Monroe?
PD Smith: [gave her address in Monroe]
APCS Roussel: Alrighty [sic], thank you.
PD Smith: Okay, bye bye.
|7The hearing officer received City Exhibits 2, 3, and 4 into evidence without objection.
On cross-examination, Ms. Roussel testified without equivocation that she did not fire or terminate Ms. Smith on August 31, 2008, and did not advise her that she was being terminated. Furthermore, when asked by the hearing officer if it was her understanding that Ms. Smith was being terminated, Ms. Roussel replied that was not her understanding. Ms. Smith testified that when Ms. Roussel told her that Sergeant Flot said to turn in her identification, she thought she was fired. We note that there is nothing in the taped conversation between Ms. Roussel and Ms. Smith to indicate that Ms. Smith thought she had been fired. We also note that, when questioned by her counsel, Ms. Smith admitted that when she returned to work on September 10, 2008, she did not think there was any problem. She worked eight hour days and overtime when requested until June 1, 2009. This is inconsistent with a belief that she was fired. She testified, in fact, that no one told her during that nine-month period that she was going to be fired. She denied having *818 spoken to Sergeant Flot about the incident.
Ms. Roussel testified that she had been advised by her superiors, either Sergeant Claude Flot or Captain Tammy Burcett, to advise persons calling in sick to turn in their identification. Ms. Roussel did not know the reason for that directive and had not had any discussions with Sergeant Flot about the policy. Ms. Roussel testified that to her knowledge Ms. Smith was still employed by the NOPD, so she advised her to bring a Form 50 when she returned to work.
On re-direct examination, Ms. Roussel testified that there was no NOPD work going on at the time in Monroe. She originally told Ms. Smith to go to the Convention Center because the NOPD had been attempting to establish a | ^temporary site there for people who were unable to return to work. That plan was altered, and such persons were to report to Captain John Thomas of the Public Integrity Bureau in Hammond, as she advised Ms. Smith. Based on her investigation, Ms. Roussel found no indication that anyone in Ms. Smith’s chain of command had given her permission to be absent from August 31, 2008 through September 10, 2008. Had Ms. Smith received such permission, Ms. Roussel would not have sustained the violations.
Sergeant Flot, an NOPD sergeant assigned to the Administration and Support Bureau, Communications Division, testified that it was his duty during the Hurricane Gustav activation to oversee the activities of the police dispatchers. He testified that he instructed Ms. Roussel to request the police identification badges of personnel who did not appear during the hurricane activation. Because of problems that had arisen in the aftermath of Hurricane Katrina involving inappropriate use of NOPD-issued credentials, he and Captain Burcett decided that they did not want anyone who had not reported in response to the activation to have the use of their identification. Sergeant Flot testified that he did not give Ms. Smith permission to be absent during the emergency activation period in question and did not advise her that she did not have to comply with the requirements of the Alert Level One policies relating to sick leave. In fact, he could not have granted her permission to be absent because of sickness during the emergency activation, and was unaware that any other supervisor gave her such permission. Sergeant Flot also noted that particularly during emergency situations, when personnel work twelve-hour shifts, the absence of an employee negatively affects the performance and efficiency of the NOPD Communication Department.
|;,On cross-examination, Sergeant Flot testified that he was informed by one of the supervisors that Ms. Smith had called in sick from Monroe, Louisiana. He said that he believed that personnel who were on sick leave or other leave during the emergency were allowed to return to work. He made no recommendation concerning Ms. Smith’s termination.
Ms. Smith testified that her only contact with Chief Weathersby was on May 19, 2009, for her Commander’s Hearing. She denied having seen Chief Warren Riley. Ms. Smith admitted that she did not speak to anyone in the Office of Compliance about her headache. She admitted that she evacuated from New Orleans to Monroe with her husband and the rest of her family. On September 16, 2008, she gave a statement concerning her absence. She was informed that the statement was necessary because she had not shown up for work during the emergency activation, and understood that she was the subject of an investigation. She testified that she *819 thought the matter had concluded after she gave her statement.
Chief Weathersby testified that he is the Deputy Chief for the NOPD Administration and Support Bureau and previously served as a Major over Compliance in the office of the NOPD Superintendent. He described the hierarchy of the communication office. Captain Tammy Bureett is the Commander. Under Captain Bureett are the sergeants, including Sergeant Flot. The command desk is under the sergeants. Anyone to whom the Captain gives authority to do so may tell an officer to turn in his or her identification. Turning in identification has multiple meanings, depending on the circumstances. In case of the storm, Captain Bureett made a decision that it would be advisable to collect the identification badges of personnel going out of town. Also, persons who are reassigned, on medical leave |inor psychiatric leave, may be asked to turn in their identification. Chief Weathersby said there are a multitude of reasons for asking a person to turn in his or her identification. From the NOPD’s standpoint, a request to turn in identification is not equivalent to firing the person, specifically because every member of the police department knows that termination requires a hearing and that only the Superintendent can make the final determination of a termination. Chief Weathersby noted that even he is able only to make a recommendation to the Superintendent following a hearing. Chief Weathersby testified that in Ms. Smith’s case, following the hearing, he decided to recommend her termination. At the time she did not return to work he did not suspend or terminate her, because there had not been a hearing.
When questioned by the hearing officer concerning the nine month delay before the termination, Chief Weathersby testified that there were multiple cases involving dispatchers and complaint officers who did not report when ordered to do so. Each case was investigated individually, and when the investigation was completed, the matter was scheduled for a Bureau Commander’s hearing. Once it was determined that these matters would involve Bureau hearings, the actual scheduling began, with each case scheduled for an individual hearing with Chief Weathersby, based upon his availability. He noted that he had other ongoing responsibilities that contributed to the delay. During the interim, while awaiting their hearings, the dispatchers and complaint officers returned to full duty with full benefits, and were not deprived of any benefit.
Chief Weathersby testified that he examined each case individually, considering the individual circumstances and factors that were involved. After this consideration, he determined if the appropriate penalty would be suspension, | n termination, or no penalty at all. In Ms. Smith’s case, he noted that she was at work when the emergency activation was enacted, so she knew that she was expected to be at work and could not leave. She worked the night before the morning she left town. When she called back later that day, she was already six to eight hours away from New Orleans and had made the decision that she wasn’t going to return in a timely manner. She took ten days to go to the hospital, claiming she had a severe migraine headache, but provided no medical records to support this. The Form 50 indicates that she did not see a doctor until September 10, 2008, because she needed a Form 50 in order to be allowed to report back to work. Chief Weathersby concluded that she had made up her mind that she was not coming to work, and left the city when she knew she was supposed to stay. Then, when she knew she needed documentation to return to work, she went to a doctor ten days later. Although she *820 claimed to be in a severe and grave medical situation, she did not see a doctor for ten days. Chief Weathersby testified that he also took into consideration the fact that she had worked for the NOPD for about twenty years, her medical condition as reported on the Form 50, and her statement admitting that she left town the day after her night shift and called in from her evacuation destination that day.
Following the hearing, on October 27, 2009, the hearing officer found that the NOPD had established by a preponderance of evidence that it disciplined Ms. Smith for cause. The hearing officer concluded:
The Appointing authority [NOPD] rejected the Appellant’s belated medical certification. Internal rules require a medical certification within forty-eight hours of the emergency activation. The Appellant failed to follow that requirement. The timing of the Appellant’s illness is suspect. Further, the fact that the Appellant waited until after the emergency activation, and after she returned to |i2the City to seek medical treatment suggests that her illness was contrived to avoid her responsibilities as an essential employee. Finally, the Appellant went to a doctor on the same day she was released to return to work. Her actions strongly suggest that she did not need to see a doctor because she was ill, but merely to provide justification for her failure to perform her duties during an emergency.
The CSC denied Ms. Smith’s appeal on March 29, 2010, finding, for the reasons cited by the hearing officer, that the NOPD had established by a preponderance of evidence that it disciplined her for cause.
An employee who has gained permanent status in the classified city civil service cannot be subjected to disciplinary action by his employer except for cause expressed in writing. The employee may appeal from such disciplinary action to the CSC. The burden of proof on appeal, as to the facts, shall be on the appointing authority. La. Const, art. X, § 8 (1974); Mitchell v. Department of Police, 09-0724, pp. 2-3 (La.App. 4 Cir. 3/17/10), 34 So.3d 952, 953. The CSC’s decision is subject to review on any question of law or fact upon appeal to the appropriate court of appeal. La. Const, art. X, § 12(B). The CSC has a duty to independently decide, from the facts presented, whether the appointing authority had good or lawful cause for taking disciplinary action and, if so, whether the punishment imposed was commensurate with the dereliction. Mitchell v. Department of Police, supra at p. 3, 34 So.3d at 953, citing Walters v. Department of Police of the City of New Orleans, 454 So.2d 106, 113 (La.1984). Legal cause for disciplinary action exists whenever an employee’s conduct impairs the efficiency of the public service in which that employee is engaged. Cittadino v. Department of Police, 558 So.2d 1311, 1315 (La.App. 4th Cir.1990). The appointing authority has thejjoburden of proving, by a preponderance of the evidence, that the complained of activity occurred, and that such activity bore a real and substantial relationship to the efficient operation of the public service. Id.
In civil service disciplinary cases, an appellate court is presented with a multifaceted review function. First, as in all civil matters, deference will be given to the factual conclusions of the CSC, so that in deciding whether to affirm the CSC’s factual findings, we apply the clearly wrong or manifest error standard of review. Bannister v. Department of Streets, 95-0404, p. 8 (La.1/16/96), 666 So.2d 641, 647. Second, in evaluating the CSC’s determination as to whether the disciplinary action *821 is both based on legal cause and commensurate with the infraction, we are not to modify the commission’s order unless it is arbitrary, capricious, or characterized by abuse of discretion. Id. “Arbitrary or capricious” means that there is no rational basis for the action taken by the CSC. Id.
Ms. Smith contends that the NOPD’s disciplinary action was excessive, and failed to take into account any mitigating factors, such as her long service as an NOPD employee without any major infractions, and was arbitrary, capricious, and an abuse of discretion. She also contends that the CSC erred in finding that she elected to see a doctor not because she was ill, but merely to provide justification for her failure to perform her duties during an emergency.
Ms. Smith cites cases in which NOPD imposed suspensions of varying terms against police officers who left their posts for between two and fourteen days during and after Hurricane Katrina, suggesting that her termination was an excessive punishment and that the disciplinary action was arbitrary and capricious. In Allen v. Department of Police, 09-0589 (La.App. 4 Cir. 11/12/09), 25 So.3d 966, writ denied, 09-2714 (La.2/26/10), 28 So.3d 273, this Court addressed the |14specific issue of whether termination was excessive discipline for a police officer who had been absent from her position for two months after Hurricane Katrina and found that termination was reasonable. Likewise, in LeBlanc v. Department of Police, 07-1168 (La.App. 4 Cir. 11/21/07), 972 So.2d 398, this Court affirmed a CSC finding that termination of an NOPD officer who failed to report for duty during the aftermath of Hurricane Katrina, from August 28, 2005 to September 19, 2005 was not excessive. As noted in a concurring opinion in that case, “[T]he discipline imposed was not excessive in that it was consistent with the uniform amount of discipline set forth by the Superintendent for those officers who were missing for the same amount of time as was Mr. LeBlanc and the punishment was commensurate with the infraction.” In light of the fact that the displacement of New Orleans citizens in the aftermath of Hurricane Katrina was far more extensive in both time and place than that occasioned by Hurricane Gustav, we cannot say that the NOPD or the CSC were arbitrary or capricious or acted unreasonably in approving termination for Ms. Smith, who was absent for ten days. On the record of these proceedings taken as a whole, we do not find the discipline imposed under the particular circumstances of this case to be excessive.
Ms. Smith refers in brief to her personnel record, and suggests that it contains negative material referring to another NOPD employee of the same name. The personnel record is not a part of this record and there is no indication that the NOPD, the hearing officer, or the CSC relied on any adverse material contained therein. Ms. Smith admits in brief, “Whether Deputy Chief Weathersby and Superintendent Riley mistakenly relied on this error is strictly conjecture.” Such conjecture by the appellant, based on material dehors the record, cannot form a | ^reasonable basis for a finding of manifest error or arbitrary and capricious behavior by the CSC.
Ms. Smith, as a long-term employee of the NOPD, was aware of the significant role communications personnel such as she play in the continuing operations of the department during such a crisis. There is uncontroverted testimony in the record indicating that her absence impaired the efficient operation of the department during the emergency activation occasioned by the imminent arrival and aftermath of Hurricane Gustav. It is clear from the *822 uncontradieted testimony in the record that Ms. Smith was on duty after the emergency activation was declared and evacuated with her family without prior notice to her superiors within hours of having left her post. We find no error in the NOPD’s finding that Ms. Smith violated its rules by having failed to provide a medical certification within forty-eight hours of the emergency activation. We likewise find nothing manifestly erroneous or clearly wrong in the hearing officer’s and CSC’s evaluation of Ms. Smith’s testimony and their subsequent conclusion that the timing of her illness is suspect and that her delay in seeking medical treatment was contrived to avoid her responsibilities as an essential employee. These reasonable credibility determinations will not be disturbed on appeal. We find no manifest error in the CDC’s factual conclusions, and nothing arbitrary or capricious in its determinations that Ms. Smith was terminated for cause and that the discipline imposed by the NOPD was reasonable under all of the circumstances of this case.
For the foregoing reasons, we affirm the order of the CSC upholding the discipline imposed by the appointing authority.
AFFIRMED.