GARY HARDY

VERSUS

JUVENILE JUSTICE
INTERVENTION CENTER

*      NO. 2022-CA-0030

*      COURT OF APPEAL

*      FOURTH CIRCUIT

*      STATE OF LOUISIANA

\* \* \* \* \* \* \*

APPEAL FROM
CITY CIVIL SERVICE COMMISSION ORLEANS
NO. 9165
Honorable Jay Alan Ginsberg, Hearing Officer
\* \* \* \* \* \*
**Judge Rosemary Ledet**
\* \* \* \* \* \*

(Court composed of Judge Roland L. Belsome, Judge Rosemary Ledet, Judge
Sandra Cabrina Jenkins)

Ernest L. Jones
ATTORNEY AT LAW
2317 Canal Street
New Orleans, LA 70119

     COUNSEL FOR PLAINTIFF/APPELLANT

Elizabeth Robins
DEPUTY CITY ATTORNEY
1300 Perdido Street, Suite 5E03
New Orleans, LA 70112

     COUNSEL FOR DEFENDANT/APPELLEE

**AFFIRMED**
**June 16, 2022**

This is a Civil Service Commission of the City of New Orleans ("CSC") case. The appellant, Gary Hardy, seeks review of the CSC's September 29, 2021 decision, denying his appeal and upholding his termination from employment with the Department of Human Services Juvenile Justice Intervention Center ("JJIC"). For the reasons that follow, we affirm the CSC's decision.

## FACTUAL AND PROCEDURAL BACKGROUND

At all pertinent times, Mr. Hardy had permanent status as a Maintenance Engineer Second Class with the JJIC—a facility run by the City of New Orleans to care for juveniles and youths assigned there. His employment responsibilities included making sure the air-conditioning units and chillers properly functioned. Mr. Hardy began working with the JJIC in 2015. These proceedings arise out of two separate incidents that occurred five years later, in 2020, during the COVID-19 (Coronavirus) pandemic.

The first incident involved Mr. Hardy's failure to comply with COVID-19, high frequency cleaning procedures and resulted in a seven-day suspension.[1] On April 20, 2022, Mr. Hardy attended a meeting with, among others, Dr. Kyshun Webster, Sr., JJIC's Executive Director; and Shaun Lewis, JJIC's Building and Maintenance Superintendent and Mr. Hardy's supervisor (the "Suspension Meeting"). At the Suspension Meeting, Mr. Hardy was notified of his seven-day suspension for the first incident, which was to commence the next day. According to Mr. Hardy, as he was leaving the Suspension Meeting, he told Dr. Webster and Mr. Lewis that they "need[ed] to provide [him] with a relief." But, neither Dr. Webster nor Mr. Lewis recalled Mr. Hardy making this statement.

After the Suspension Meeting, Mr. Hardy was allowed to complete his workday. At about 4 p.m. that day—right before leaving work—Mr. Hardy went on the roof of the building and turned off the chillers that controlled the air conditioning units. Mr. Hardy admitted that he did not tell anyone at JJIC that he was doing this. He, however, claimed that he visited the offices of several individuals in management of JJIC, but none was present in their offices when he finished his workday. He further claimed that the next morning, he notified Safety and Permits Office for the City of New Orleans.

Mr. Hardy's justification for turning off the chillers was a City Code ordinance that requires a stationary engineer be present when air conditioners of a

---

[1] The first incident is the subject of Mr. Hardy's separate appeal. *See Hardy v. Juvenile Justice Intervention Center*, CSC No. 9162; Louisiana Fourth Circuit Court of Appeal, No. 2021-CA-0715 ("*Hardy I*").

certain tonnage are in operation—Code of the City of New Orleans, Stationary Engineers, Chapter 27-17, § 135 (the "Ordinance"). According to Mr. Hardy, his "license was on the line" because he was one of two engineers on JJIC's staff, and the other engineer was on civil leave. With the other engineer on leave and Mr. Hardy suspended, Mr. Hardy reasoned that there was no other person on JJIC's staff who had the necessary license to operate the chiller equipment on the premises. For this reason, he believed it was his responsibility to turn off the chillers.

One week later, Mr. Hardy was notified of a pre-termination meeting based on the second incident. In the pre-termination notice, Mr. Hardy was informed that the JJIC was investigating his actions that occurred on the afternoon of April 20, 2020, following the Suspension Meeting, to determine whether he would be the subject of another disciplinary matter. Mr. Hardy was further informed that the investigation was to confirm the following:

> If [Mr. Hardy] "directly or inadvertently caused the chillers to shut down or go off-line; therefore, having a contractor report to the facility on Monday [April 20, 2020,] at approximately 11:00 pm to service and/or repair the air conditioning chillers. As per the Building & Maintenance Superintendent, Shaun Lewis, the contractor informed him that the chiller did not require service/repair, but that the disconnect switch was turned off by someone."

On April 28, 2020, Mr. Hardy's pre-termination meeting was held. At this meeting, Mr. Hardy admitted he turned off the chillers. On the next day, Dr. Webster notified Mr. Hardy, by written termination letter, of his decision to terminate Mr. Hardy's employment effective that date. In the termination letter, Dr. Webster notified Mr. Hardy of the reasons for the termination decision:

- This disciplinary action was taken based on the Department's investigation into your actions on Monday, April 20, 2020, in which you intentionally shut down the facility's chillers, taking the facility's air conditioning system off-line, including but not limited to the pods housing all detained juveniles.

- You acknowledged [at the pre-termination hearing] that you did in fact go onto the roof of the facility and manually turn off the chillers causing them to go off-line and/or shut down, after you were advised that you would be on a suspension for seven (7) days, beginning on April 21, 2020.

- You explained to Debra L. Calderon [JJIC's Human Resource Manager] and Shaun Lewis, Building & Maintenance Superintendent, that as an engineer, you believe it was your responsibility to shut everything down once you were advised that you would be on suspension for seven days beginning the next day, April 21, 2020.

- You did not notify your immediate Supervisor [Mr. Lewis] or anyone in JJIC's administration, that you had turned off the chillers before leaving work on Monday, April 20, 2020, to confirm that this action was necessary, based solely on you being out on a disciplinary suspension.

- Your actions demonstrate poor judgment, and unprofessional behavior as is required of City employees pursuant to CAO Policy No. 83, on standards of behavior expected of City employees.

- You acted with disregard for the comfort and safety of your co-workers at the facility and for those juveniles detained at the facility, which [is] a violation of the Louisiana Juvenile Detention Standards: §7519.[2]

- There is no policy or procedural requirement for you to shut down the facility's chillers at the end of a daily work shift. Additionally, there is no policy or procedural requirement for you to shut down the facility's chillers at the end of a daily work shift.

- Your claim that you did this because you were not being "relieved" by another engineer ignores the fact that you are not the only engineer, nor are you relieved by another engineer at the end of you daily shift as there is no requirement to have engineers on cite at the facility 24 hours a day, seven days a week.

- This action was taken pursuant to Civil Service Rule 9.1.1.[3]

---

[2] Louisiana Juvenile Detention Standards: §7519. Physical Environment, Section A.5 provides that "[t]he provider shall provide heating, cooling and ventilation systems that are appropriate to summer and winter comfort zones, with no unhealthy extremes."

[3] Civil Service Rule 9.1.1. provides:

Mr. Hardy appealed his termination to the CSC.

At the August 17, 2020 hearing before the Hearing Examiner, the JJIC called four witnesses—Mr. Hardy; Mr. Lewis; Dr. Webster; and Dichelle Williams, Superintendent on Residential Life; Mr. Hardy called two witnesses—himself; and Sterling Higgins, Plant Engineer for the City's Department of Property Management. Following the hearing, the Hearing Examiner recommended that Mr. Hardy's appeal be denied. The Hearing Examiner concluded that "[t]he undisputed facts establish that [Mr. Hardy] turned off the facilities' HVAC system without informing his superiors of his actions. His interpretation of the City Code [Ordinance] is overly broad and does not justify his unilateral actions that appear to have been taken in retaliation for receiving a suspension."

Agreeing with the Hearing Examiner's recommendation, the CSC denied Mr. Hardy's appeal. In its decision, the CSC found that Mr. Hardy intentionally turned off the chillers at the JJIC in retaliation for his seven-day suspension and that termination of his employment was commensurate with his misconduct. From the CSC's decision, this appeal followed.

**GOVERNING LEGAL PRECEPTS AND STANDARD OF REVIEW**

---

When an employee in the classified service is unable or unwilling to perform the duties of his/her position in a satisfactory manner, or has committed any act to the prejudice of the service, or has omitted to perform any act it was his/her duty to perform, or otherwise become subject to corrective action, the appointing authority shall take action warranted by the circumstances to maintain the standards of effective service.

The Rule further provides that the actions that may be taken include termination.

This court, in *Collier v. Sewerage & Water Bd.*, 18-0097, pp. 6-7 (La. App. 4 Cir. 8/1/18), 253 So.3d 190, 194-95, summarized the governing legal precepts applicable to a CSC case as follows:

> An appointing authority may discipline an employee with permanent status in the classified service for sufficient cause expressed in writing. If an employee believes that an appointing authority issued discipline without sufficient cause, the employee may appeal to the CSC. In an appeal before the CSC brought pursuant to Article X, § 8(A) of the Louisiana Constitution, the appointing authority has the burden of proving, by a preponderance of the evidence: 1) the occurrence of the complained of activity; and 2) that the conduct complained of impaired the efficiency of the public service in which the appointing authority is engaged. If the CSC determines that the appointing authority has met its initial burden and had sufficient cause to issue discipline, it must then determine if that discipline "was commensurate with the infraction."

*Id*. (internal citations omitted); *see also Green v. New Orleans Recreation Dev. Comm'n*, 16-1122, pp. 8-10 (La. App. 4 Cir. 5/10/17), 220 So.3d 165, 171-72.

To recap, three elements that must be established in a CSC case to support an appointing authority's disciplinary decision: (1) the occurrence of a complained of act or infraction—misconduct; (2) the impairment, as a result of the misconduct, of the department's efficient operation—impairment; and (3) discipline commensurate with the misconduct—punishment. *See Collier*, *supra.*

The CSC's final decision is "subject to review on any question of law or fact upon appeal to the court of appeal wherein the commission is located." LA. CONST. ART. X, § 12(A). An appeal from a final decision of the CSC, thus, is to this court. In a CSC case, this court must engage in a multifaceted review, which the Louisiana Supreme Court has described as follows:

> Initially, deference should be given to the factual conclusions of the civil service commission. A reviewing court should apply the clearly wrong or manifest error rule prescribed generally for appellate review. Then, the court must evaluate the commission's imposition of a particular disciplinary action to determine if it is both based on legal

cause and is commensurate with the infraction; the court should not modify the commission's order unless it is arbitrary, capricious, or characterized by abuse of discretion. "Arbitrary or capricious" means the absence of a rational basis for the action taken; "abuse of discretion" generally results from a conclusion reached capriciously or in an arbitrary manner.

*Mathieu v. New Orleans Pub. Library*, 09-2746, pp. 5-6 (La. 10/19/10), 50 So.3d 1259, 1262-63 (internal citations omitted).

## DISCUSSION

Although Mr. Hardy assigns multiple errors,[4] the thrust of his argument is that the JJIC failed to meet its burden of proving the three elements required in a CSC case—misconduct, impairment, and punishment. He also makes two other arguments—the Commission's delay in deciding his appeal violated its own rules; and the Hearing Officer's refusal to allow him to proffer a motion in limine was reversible error. We first address the delay and proffer issues and then address the misconduct, impairment, and punishment issues.

*Delay*

Two Civil Service Rules provide time limits for deciding CSC appeals. First, Civil Service Rule II, §4.11 provides that the "hearing examiner will prepare a report of the proceedings for the Commission within fifteen (15) working days

_____

[4] Mr. Hardy's assigns as error the following:

1. The Hearing Officer erred when he failed to consider all of the evidence that Gary Hardy acted in a reasonable manner for safety of in-house juvenile residents.

2. Whether the Civil Service Commission erred in taking over a year to issue a ruling.

3. The Civil Service Commission erred when it did not take in consideration that the termination was not commensurate to the offense.

4. The Civil Service Commission erred when it held that the termination was commensurate to the offense.

5. The Hearing Office erred when he refused to allow a proffer of the Motion In Limine to [p]reserve appellate rights of review for Gary Hardy.

7

after the completion of the hearing." Second, Civil Service Rule II, §4.17 provides, in pertinent part:

> Appeals to the Commission shall be decided promptly but in any event within ninety (90) calendar days after completion of a hearing. In the event the hearing has been held before a Hearing Officer or Referee . . . the ninety (90) day period shall begin to run upon receipt by the Commission of the Hearing Officer's Report and official transcript of the testimony of said hearing.

Citing these rules, Mr. Hardy contends that he should be reinstated with back pay because the CSC failed to follow the rules. He emphasizes that the CSC took over a year to issue its ruling.[5] JJIC counters that the deadlines were exceeded through no fault of either party. Regardless, the jurisprudence, JJIC points outs, has rejected the same argument Mr. Hardy makes—that failure to follow the rules requires reversal of the discipline. *Jackson v. Sewerage & Water Bd*., 09-0071, pp. 5-6 (La. App. 4 Cir. 5/13/09), 13 So.3d 225, 228.

In *Jackson*, this court observed as follows:

> Civil Service Rules require the Commission to decide an appeal within ninety (90) days after receiving the hearing officer's report. Although in this matter the hearing officer's report is not dated, the fact that the appeal was decided some 653 days beyond the guidelines set by the rules is clearly abusive. However, a reversal cannot be based solely on an untimely decision. *Bannister v. Dept. of Streets*, 95-0404, p. 7 (La. 1/16/96), 666 So.2d 641, 647(clearly stating the Rule II, Section 4.16 is not a mandate, but merely "directory").

*Id.* Moreover, the Supreme Court, in *Bannister*, recognized that not only the civil servant (employee), but also the Appointing Authority, has rights; the Supreme Court observed that "[w]ithout a doubt, equally as great an injustice may arise from suffering the continuance of incompetent or insubordinate civil servants as from wrongfully terminating the 'protected property rights of permanently

---

[5] The time line here was as follows: on August 17, 2020, the hearing was held; on January 9, 2021, the hearing examiner issued his report; and on September 29, 2021, the Commission issued its decision.

classified civil service employees to their positions.'" *Bannister*, 95-0404, p. 9 (La.1/16/96), 666 So.2d at 646. This court, in *Jackson*, observed that we have "admonished the Commission for lengthy delays in past opinions, but we are bound to determine the outcome of the cases on the merits." *Id.* (citing *Bovia v. Dep't of Police*, 08-0710 (La. App. 4 Cir. 1/7/09), 2 So.3d 1159; and *Patterson v. New Orleans Fire Dep't*, 98-1168 (La. App. 4 Cir. 12/23/98), 727 So.2d 551).[6] Based on the settled jurisprudence, we find Mr. Hardy's delay argument unpersuasive.

*Proffer*

Mr. Hardy's next argument is that the Hearing Examiner erred in refusing to permit him to fully proffer evidence related to his motion in limine, which he contends evidenced Dr. Webster's personal animosity against him. JJIC counters that the evidence Mr. Hardy seeks to proffer is both irrelevant and inadmissible and that Mr. Hardy was allowed to proffer the entire motion in limine. JJIC contends that it was within the Hearing Examiner's discretion to allow Mr. Hardy to proffer his motion in limine, but to refuse any further testimony regarding the inadmissible allegations outlined therein. We agree.

Although the opportunity to proffer excluded evidence is mandatory under La. C.C.P. art. 1636,[7] the trier of fact—here, the Hearing Examiner—has the discretion to allow the proffer in full or to require a statement setting forth the

---

[6] *See also DeLarge v. Dep't of Fin.*, 94-1684, p. 6 (La. App. 4 Cir. 3/27/96), 672 So.2d 1025, 1029-30 (observing that "the Supreme Court recently held that Rule II, Section 4.16 is 'directory' in nature, rather than 'mandatory,' and that the Commission's failure to decide an appeal within the ninety day period does not require that the employee's appeal be sustained or that the Commission's decision be reversed" and that "the Commission's delay in deciding Mr. DeLarge's appeal, is not a basis for reversing the Commission's decision in this case").

[7] La. C.C.P. art. 1636 (A) provides: "[w]hen the court rules against the admissibility of any evidence, it shall either permit the party offering such evidence to make a complete record thereof, or permit the party to make a statement setting forth the nature of the evidence."

nature of the evidence.[8] The Hearing Examiner allowed the entire motion in limine to be filed into the record as a proffer; and the proffer is included in the record on appeal.[9] Mr. Hardy's proffer argument is unpersuasive.

*Misconduct*

Mr. Hardy does not dispute that he turned off the HVAC system—the chillers—at the JJIC; rather, he claims that he was required to turn off the chillers before leaving to serve his suspension because no qualified person would have been present. In support, he cites the Ordinance.[10] In further support of his

---

[8] As a commentator points out, La. C.C.P. art. 1636 requires that a trial court in civil cases take one of two actions when a party wants to make a proffer:

- Allow a complete record of the proffered testimony; or

- Allow presentation of a statement describing what the party expects to prove by the proffered evidence.

Hon. Billie Colombaro, John W. deGravelles, David R. Frohn, LA. PRAC. CIV. TRIAL § 5:161.

[9] Mr. Hardy also proffered the same exhibit during the hearing on his seven-day suspension. See *Hardy I.* At the beginning of the hearing in this case, the Hearing Examiner stated:

> Okay. And, just a bit of housekeeping, in the companion case of this, docket number 9162 [*Hardy I*], I noted I was not going to allow a motion in limine that applied to both of these docket numbers. I will say for the record that civil service rules do not provide for motions in limine, and while the rules of evidence and procedure are looked at as a guidance, we don't follow them. And so, I have denied the — we are not even going to look at the motion in limine.

The Hearing Examiner's statement regarding not following rules of evidence is consistent with the jurisprudence. *See Dundy v. Louisiana State Univ. in Baton Rouge*, 394 So.2d 650, 653 (La. App. 1st Cir. 1980) (observing that "[s]trict compliance with the Rules of Evidence in administrative hearings is not mandatory").

[10] The Ordinance is several pages long. At the hearing, Mr. Hardy's counsel quoted what he viewed as the pertinent language of the Ordinance: "[o]n line 842, it says, "it is unlawful for a person", and I am going to skip all of those other words, going down to 843, "permit to be operated", skipping to 844, "air conditioning equipment", skipping to 845, "without a properly qualified person having the necessary license on the premises at all times while such stationary equipment is in operation."

As the JJIC points out, the Ordinance also states that if a properly qualified person is not on the premises while certain air conditioning equipment is in operation, "the Director [of Safety and Permits] shall notify the owner in writing to correct such condition within 10 days." It further provides that "[u]pon failure to comply with this notice, the respective Electrical and/or

position, Mr. Hardy cites Mr. Higgin's testimony regarding what he would have done under similar circumstances, which was as follows:

> "[He] would inform the appropriate parties; If it is a police headquarters, I would say, hey, look, we are going to be out of air for at least a couple of hours until we find someone, so I am just letting you know the building will be uncomfortable, too hot or too cold or whatever, whatever time the year is. If it is a court, same thing, I would inform the judges, look, you all are going to be without air."

Mr. Higgin's view, consistent with Mr. Hardy's construction of the Ordinance, was that an engineer is required to be present at all times when certain equipment is in operation and that if no one was present to relieve him, the equipment would have to be turned off.

In contrast, Dr. Webster testified that he disagreed with Mr. Hardy's construction of the Ordinance. Although there was no licensed engineer physically on the JJIC's premises at all times, Dr. Webster explained that City resources were available, including other engineers, to respond to any issues concerning the facility's HVAC system. Dr. Webster observed that Mr. Hardy was not authorized to shut off the chillers and that it was not normal protocol for an occupied building to do so. Dr. Webster additionally observed that the health and welfare of the JJIC's residents took precedence over any concerns regarding the interpretation of the Ordinance. Dr. Webster emphasized that by state regulations, the JJIC is duty bound to maintain climate control and a humane environment for juveniles in their custody.

Based on the evidence presented, we find no error in the CSC's conclusion that "[a]lthough an ordinance does require the presence of an engineer, and it may

---

Mechanical Division Chiefs shall request the Utility Company to discontinue either the electric and/or gas service, until such time that a person with a valid license is operating the stationary equipment in the discrepant building, structure or plant."

have been appropriate to shut down the system temporarily until an engineer could arrive on site, Mr. Hardy's intention was to interfere with the operation of the JJIC." This conclusion is supported, as the CSC observed, by Mr. Hardy's failure to inform anyone at the JJIC that he was shutting the chillers.

The closest Mr. Hardy came to informing anyone that he was going to shut off the coolers was his alleged statement, when exiting the Suspension Meeting, that they "need[ed] to provide [him] with a relief." But, both Dr. Webster and Mr. Lewis testified that they did not hear Mr. Hardy make the statement. Regardless, the statement was vague and did not reference the Ordinance. As the CSC observed, if Mr. Hardy's true concern was complying with the Ordinance, he would have informed his supervisor, Mr. Lewis, or the director, Dr. Webster, in no uncertain terms that he intended to shut off the air conditioning because no engineer would be present to relieve him.

Given Mr. Hardy's admission that he turned off the chillers coupled with his lack of communication to anyone with the JJIC regarding his actions, we cannot conclude the CSC erred in finding the first element—misconduct—satisfied.

*Impairment*

The next issue we address is whether the CSC correctly found that the JJIC satisfied the second element—impairment. Mr. Hardy argues that the misconduct resulted only in an inconvenience—lack of air conditioning at the JJIC for a few hours—and not an impairment. Moreover, he contends that the reverse could have been true had he failed to turn off the chillers when he left for his suspension.[11]

---

[11] According to Mr. Hardy, if had he failed to turn off the chillers, the JJIC's operations could have been impaired. Thus, he argues, in his appellant brief, that he "exercised reasonable care when he shut off the chillers the end of his work shift because no licensed engineer was present on the premises as required by the City Ordinance to protect the lives and safety of the in-house

Rejecting Mr. Hardy's argument and finding that the JJIC carried its burden of proving the impairment element, the CSC observed:

> The Appointing Authority has carried its burden of proving that Gary Hardy intentionally turned off the air conditioning system at the JJIC on April 20, and that this action was in retaliation for the suspension imposed on April 20. If Gary Hardy's main concern [was] compliance with the City's ordinance requiring an engineer to be on the premises, he would have informed his supervisor [Mr. Lewis] and/or the Director [Dr. Webster] in clear and uncertain terms that he intended to shut off the air conditioning because no engineer would be present. Although an ordinance does require the presence of an engineer, and it may have been appropriate to shut down the system temporarily until an engineer could arrive on site, Mr. Hardy's intention was to interfere with the operation of the JJIC. The individuals who suffered from Mr. Hardy's retaliation were the residents of the JJIC. In addition to the extra expenses caused by the absence of air conditioning, the JJIC was out of compliance with state regulations requiring appropriate cooling of the physical plant.

Our review of the record supports the CSC's finding that the impairment element was met. Mr. Hardy's contention that his misconduct only caused an inconvenience, not an impairment, is belied by the record. Indeed, the record supports the JJIC's counter position that Mr. Hardy's misconduct caused a severe impairment on the efficiency of its operations.

First, the temperature in the facility increased within hours of Mr. Hardy shutting off the chillers to the point that employees complained and juveniles who were quarantined because of COVID-19 exposure had to be relocated. Mr. Lewis testified that he had to return to work that night and that outside contractors had to come out to the JJIC that night on an after hour basis to address the HVAC problem.

---

juvenile residents and staff at the [JJIC] and guard against a catastrophic event which could have interrupted the efficient operations of the [JJIC]."

Second, JJIC is licensed by the Department of Children and Family Services ("DCFS"). The DCFS's regulations require certain housing standards for the JJIC, including appropriate cooling without unhealthy extremes. Mr. Lewis and Ms. Williams testified that the misconduct jeopardized the health and well-being of JJIC's residents and placed the facility's DCFS license in jeopardy.

Third, Dr. Webster testified that the lack of appropriate air conditioning increased the risk of infection, increased JJIC's overtime expense, and required JJIC to hire outside contractors to come to the facility to determine the cause of the air condition problem. Further, Dr. Webster testified that Mr. Hardy's actions put the JJIC at risk of an infraction if a juvenile were to complain that the building was not properly climate controlled. As a result, the JJIC had to take the juveniles out of their usual habitant so that they could have air while the HAVC system was being repaired.

Based on these factors, we cannot conclude the CSC erred in finding the JJIC established the second element—impairment—and turn to the third element—punishment.

*Punishment*

Mr. Hardy's final contention is that the punishment imposed—termination—was not commensurate with the offense. He stressed that he was not a problem employee and that he helped others at JJIC; he characterized himself as a conscientious employee, who was meticulous about his work. He argues that termination is not commensurate with actions that only cause inconvenience and

claims that such is the case here. Stated otherwise, he contends his actions caused no actual harm to anyone.

Again, as discussed above, the CSC's finding that Mr. Hardy's actions impaired the JJIC's operations is not erroneous. Nonetheless, termination from permanent employment is the most extreme form of disciplinary action that can be taken against a classified or city employee. *Honoré v. Dep't of Pub. Works*, 14-0986, p. 16 (La. App. 4 Cir. 10/29/15), 178 So.3d 1120, 1131 (citing *Hills v. New Orleans City Council*, 98-1101, pp. 6-7 (La. App. 4 Cir. 12/9/98), 725 So.2d 55, 58). "When determining whether there is cause sufficient to terminate the employee when cause is required to do so, courts and commissions generally consider [multiple] factors including the seriousness of the offense, the employee's job level, past performance, and length of service, and the effectiveness of alternative sanctions to deter future similar conduct." Rick J. Norman, LA. PRAC. EMPLOYMENT LAW § 12:9.[12]

Here, Dr. Webster explained the reason he terminated Mr. Hardy was because his misconduct was a "misdeed before leaving." Dr. Webster explained that after notifying Mr. Hardy of the seven-day suspension at the Suspension Meeting, he allowed Mr. Hardy to finish out the workday, but he should have required Mr. Hardy to leave the building immediately. Dr. Webster stated that the misconduct Mr. Hardy engaged in after being suspended was intentional and retaliatory, justifying termination.

---

[12] *See also Hills v. New Orleans City Council*, 98-1101, p. 7 (La. App. 4 Cir. 12/9/98), 725 So.2d 55 (observing that "[t]he egregious nature of the offense in question is only one of several questions which should be considered by the CSC when determining whether the punishment imposed is commensurate with the offense" and that "[o]ther factors to be considered include the employee's work record, as well as the employee's previous disciplinary record").

The CSC found the penalty of termination was commensurate with the misconduct. In so finding, the CSC observed that Mr. Hardy's actions were found to be both intentional and retaliatory. Again, Mr. Hardy's actions, contrary to his contention, caused an impairment, not a mere inconvenience. Based on these factors, we cannot conclude the Commission erred in finding termination was commensurate with the offense.

## **DECREE**

For the foregoing reasons, the Civil Service Commission's decision dismissing Appellant's appeal is affirmed.

**AFFIRMED**